281 N.J. Super. 390 (1995)
657 A.2d 1224
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LOUIS ABRONSKI, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 1, 1995.
Decided May 10, 1995.
*393 Before Judges MUIR, Jr., D'ANNUNZIO and EICHEN.
Marcia Blum, Assistant Public Defender, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney).
Robin A. Hamett, Assistant Prosecutor, argued the cause for respondent (Edward F. Borden, Jr., Camden County Prosecutor, attorney; Ms. Hamett and Roseann A. Finn, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Tried to a jury under Camden County Indictment No. 1109-4-90, defendant was convicted of first degree aggravated sexual assault and second degree sexual assault. The court sentenced defendant to fifteen years imprisonment for the first degree offense and to a concurrent term of seven years for the second degree offense. Defendant appeals.
Defendant contends that his confession should have been suppressed because he was denied the opportunity to speak with a *394 lawyer during interrogation when the lawyer called the police station. The lawyer had been retained by defendant's mother moments after defendant was arrested. In State v. Reed, 133 N.J. 237, 627 A.2d 630 (1993) (hereafter Reed), the New Jersey Supreme Court held, under New Jersey law, that the police should have informed a defendant held in custody that an attorney had arrived at the police station asking to speak with him. Failure to so inform a defendant in such a situation requires suppression of any statement made thereafter. Reed was decided three and one-half years after Abronski's arrest and two years after his conviction. The issue is whether Reed applies retroactively to defendant's circumstances.
On January 30, 1990, Detective William Cruthers and Officer Robert MacFarland of the Gloucester City Police Department executed a warrant for defendant's arrest. They went to defendant's mother's house, where defendant answered their knock on the door. Defendant was asked to step outside, whereupon he was given a copy of the warrant and placed under arrest. Defendant then asked his mother to bring him a pack of cigarettes, and she complied. Cruthers testified that he was standing three feet from defendant. Both officers denied hearing defendant say anything to his mother about securing the services of an attorney. Defendant was then taken to the police car, where he was patted down and placed in the rear seat. Once in the car, defendant was advised of his Miranda rights by Cruthers. Defendant asked Cruthers "what [this] was all about," and Cruthers told him that he did not know because he had not conducted the investigation. Defendant was then driven to the Gloucester City police station, which is about two minutes from his mother's house. They arrived at approximately 10:30 a.m.
Once at the police station, defendant was taken to Cruthers' office on the second floor of the building. At that time, defendant was again advised of his Miranda rights, and was supplied with a Miranda card which defendant signed. Cruthers testified that defendant nodded his head affirmatively when asked if he understood *395 the Miranda warnings. Defendant was asked if he would give a statement, and he said that he would "talk about it."
Cruthers and MacFarland then waited a few minutes for Investigators Clare Walsh and Reginald Beckett to arrive. Walsh explained the charges to defendant. She then offered to play a videotaped interview of J.R. for defendant, in which J.R. accused defendant of sexually abusing her. Defendant agreed to watch the tape. After the videotape was shown, Walsh asked defendant if he would feel more comfortable if she left the room. Defendant responded affirmatively, and Walsh left. Walsh described defendant at that point as being a little upset. Beckett and Cruthers then engaged in a brief conversation with defendant, during which he admitted the allegations against him were true. Defendant was then asked if he would be willing to give a tape recorded statement, and he agreed. Before giving the statement, defendant was allowed to use a bathroom.
At the beginning of the formal statement, at 11:41 a.m., defendant was asked if he had been advised of his Miranda rights, and he indicated that he had. Defendant also agreed that he had signed the Miranda card and understood his rights and still wished to make a statement. In his statement, defendant said that at some point after the fourth of July 1988, he was lying on the couch naked under a blanket in the living room, feeling sexually aroused, when he asked J.R. to come near him. He asked J.R. to place her mouth over his penis, which she proceeded to do for approximately three to five minutes. When he realized what he was doing, defendant asked J.R. to stop and leave the room, but two minutes later he asked her to come back into the room. Defendant then masturbated and ejaculated in front of her. Defendant stated that at the time he was feeling lonely, and that he had not been getting much sexual attention from J.R.'s mother.
While defendant was being questioned, a dispatcher told Cruthers that defendant's mother had come to the police station. However, Cruthers did not interrupt the interrogation to allow defendant to see his mother. The dispatcher also told Cruthers *396 that an attorney had called the station and asked to speak to defendant. Cruthers advised the dispatcher to take the attorney's phone number because the officers were in the middle of the interview. Beckett similarly testified that during the interview he was called from Cruthers' office and told that an attorney was on the phone on defendant's behalf. Beckett spoke to the attorney, but did not inform defendant of the phone call. After defendant gave his statement, he was allowed to speak to his mother. Defendant was then taken to the county jail.
The threshold question in retroactivity analysis under State law is whether a new rule of law has actually been announced. State v. Burstein, 85 N.J. 394, 403, 427 A.2d 525 (1981).[1] Approximately four years before Abronski's arrest, the United States Supreme Court, in Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), held that the failure of the police to inform a suspect held in custody of an attorney's efforts to reach him did not invalidate the suspect's waiver of his privilege against self-incrimination. The Court reasoned:
Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.... [W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.
[475 U.S. at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 421.]
The Moran Court went on to add: "Nothing we say today disables the States from adopting different requirements for the conduct of their employees and officials as a matter of state law." 475 U.S. at 428, 106 S.Ct. at 1144, 89 L.Ed.2d at 425. In Reed, our Supreme Court adopted a different requirement:
When, to the knowledge of the police ... an attorney is present or available, and the attorney has communicated a desire to confer with the suspect, the police must make that information known to the suspect before custodial interrogation can *397 proceed or continue. Further, we hold that the failure of the police to give the suspect that information renders the suspect's subsequent waiver of the privilege against self-incrimination invalid per se.

[133 N.J. at 261-62, 627 A.2d 630.]
Defendant contends that Reed did not announce a new rule of law because Reed adhered to prior New Jersey law in the field, while it was the Moran decision which had constituted a "new rule of law" for purposes of retroactivity analysis.
Prior to Moran, in State v. Elmore, 205 N.J. Super. 373, 500 A.2d 1089 (App.Div. 1985), this court addressed the following facts: defendant was taken to the county prosecutor's office on suspicion of her involvement in the death of her three-month-old child. Upon arrival, defendant called her mother and, during the conversation, defendant claimed she was not being permitted to have an attorney. At that point, a detective interrupted defendant and told her that no one had denied such a request. At about this time, defendant's sister contacted an attorney, and the attorney called the prosecutor's office and asked if he could come to the office and speak with defendant. The attorney's request was granted, and when the attorney arrived at the prosecutor's office, he was told that he could see defendant if defendant wanted to speak to him. Defendant was then asked if she wanted to see an attorney who was in the office; defendant replied that she wanted to "finish up in here first." The attorney was then advised that defendant did not want to speak to him. At this point an argument ensued and the attorney was ordered out of the office. Defendant proceeded to give an incriminating statement. Id. at 376-77, 500 A.2d 1089.
We noted in Elmore that the interrogation and subsequent statement of defendant after the denial of access to her attorney was a factual scenario not directly confronted in a previous New Jersey decision. Id. at 381, 500 A.2d 1089. After examining how other jurisdictions had handled the question, we held that whichever standard was applied, "[w]hen Elmore made her statement she did not have access to the attorney who was there on her behalf, so that ... waiver was precluded." Id. at 383, 500 A.2d *398 1089. The court noted that defendant was not told of the presence of "her" lawyer, but was only asked to see "a" lawyer who happened to be in the building. Thus, the court concluded that defendant did not knowingly and voluntarily waive her right to consult with an attorney and, consequently, "his denial of access to her while she implicated herself clearly invalidated the fruits of all interrogation which took place after the denial occurred." Ibid.
We conclude that Reed announced a new rule of law. The issue decided in Reed was one of first impression for the New Jersey Supreme Court. Prior to Reed, only Elmore had addressed the issue. However, Elmore's discussion of the effect of a lawyer's unsuccessful attempt to reach a client was dictum. In Elmore, before discussing the Moran/Reed issue, we held that "Elmore's statement to her mother that she was not allowed to have a lawyer constituted the kind of an equivocal request for counsel ... which should have forestalled further interrogation." 205 N.J. Super. at 380, 500 A.2d 1089. We concluded that "the police were required under Miranda and Edwards to cease interrogating Elmore after she told her mother that they would not let her have a lawyer." Ibid. Moreover, Elmore was decided applying principles of federal constitutional law. One of the cases cited and relied on in Elmore was the Court of Appeals decision in Moran which the Supreme Court reversed approximately one year after this court decided Elmore. Thus, when the police interrogated Abronski, Elmore's underpinnings had been removed by Moran, which was the most recent pronouncement of the highest court of the land regarding the issue. Cf. State v. Skidmore, 253 N.J. Super. 227, 235, 601 A.2d 729 (App.Div. 1992) (ruling that N.J. Supreme Court determination that search of garbage violated N.J. Constitution departed from federal law and was a new rule of law for retroactivity analysis).
Reed was decided on New Jersey's privilege against self-incrimination which "is founded on a common-law and statutory  rather than a constitutional  basis." 133 N.J. at 250, 627 A.2d 630 (citing State v. Hartley, 103 N.J. 252, 260, 511 A.2d 80 (1986)). *399 The majority opinion in Reed is replete with acknowledgements that the Court was announcing a new rule. The Court stated:
Although we have, today, undoubtedly made explicit an additional responsibility of the State in its conduct toward criminal defendants, we do not believe that burden to be a heavy one.
[133 N.J. at 263, 627 A.2d 630.]
Prior to Moran, a majority of states followed a rule similar to the one we enunciate today, without any apparent diminishment in the effectiveness of their law-enforcement agencies.
[133 N.J. at 265, 627 A.2d 630.]
Virtually any rule is susceptible to a parade of hypothetical inquiries. The relevant question is whether the rule will, in actual practice, be readily and efficiently followed. We are convinced that the rule we announce today is justified both by the ease and the practicality with which it can be implemented.
[133 N.J. at 266, 627 A.2d 630.]
Accordingly, the fact that not every suspect will benefit from the rule we announce today is no reason to deny the benefits of that rule to those suspects who may be advantaged by it.
[133 N.J. at 267, 627 A.2d 630.]
Our determination of the nature and application of the ancillary right to counsel directs the focus of future judicial inquiry, in this state, away from the assessment of the subjective level of coercion to which a suspect was exposed and toward an evaluation of objective police conduct.
[Ibid.] [Emphasis added.]
Our conclusion that Reed announced a new rule of law does not end retroactivity analysis. When a new rule is based on state law, we must consider three factors in determining its retroactivity: (1) the purpose of the new rule and whether it would be furthered by retroactive application; (2) the reliance placed on the old rule by those charged with administering it; and (3) the effect that retroactive application would have on the administration of justice. Burstein, supra, 85 N.J. at 406, 427 A.2d 525; State v. Skidmore, supra, 253 N.J. Super. at 238, 601 A.2d 729.
The first factor, the purpose of the new rule, is often the pivotal consideration. Burstein, supra, 85 N.J. at 406, 427 A.2d 525. Complete retroactivity has been applied only to those cases where the purpose of the new rule is to overcome an aspect of the trial that substantially impairs its truth-finding function and the old rule did, in fact, substantially impair the reliability of the truth-finding *400 process. Id. at 406-07, 427 A.2d 525. However, where a new rule is an exclusionary rule, meant solely to deter illegal police conduct, the new rule is virtually never given retroactive effect because the deterrent purpose of such a rule would not be advanced by applying it to past misconduct. Skidmore, supra, 253 N.J. Super. at 236, 601 A.2d 729. In between those extremes is a third category of cases arising
where the new rule is designed to enhance the reliability of the factfinding process but the old rule did not "substantially" impair the accuracy of that process. In measuring the extent to which the old rule impaired the truth-finding process, two things should be considered: first, the likelihood of untrustworthy evidence being admitted under the old rule and, second, whether the defendant had alternate ways of contesting the integrity of the evidence being introduced against him. After this determination is made, the extent to which the old rule impaired the reliability of the truth-finding process is then balanced against the countervailing State reliance on the old rule and the disruptive effect that retroactivity would have on the administration of justice. Using this analysis, the United States Supreme Court has refused to grant retroactive effect to: the Sixth Amendment right to counsel during the interrogation and the Fifth Amendment right to be given Miranda warnings, Johnson v. New Jersey, 384 U.S. 719, 729-30, 86 S.Ct. 1772, 1778-79, 16 L.Ed.2d 882, 890 (1966).... In ... the above cases, the countervailing interests of State reliance on the old rule and the undisrupted administration of justice were held to outweigh the negligible effect that the old rule had on the integrity of the truth-finding process. Moreover, where there was any question as to the integrity of the truth-finding process, the defendants had alternate ways of attacking the reliability of the evidence.
[Burstein, supra, 85 N.J. at 408-09, 427 A.2d 525.]
Writing for the majority in Reed, Justice Handler explained the objectives of the Reed rule:
[O]ur decision today should be governed by a two-fold purpose: to enhance the reliability of confessions by reducing the inherent coercion of custodial interrogation and diminish the likelihood of unreasonable police conduct in those situations where police, knowing that an attorney has been retained for the suspect and is asking for contact with his or her client, are desperate to acquire a confession before the suspect speaks with the attorney.
[133 N.J. at 260, 627 A.2d 630.]
We conclude, therefore, that the goal of the Reed rule is both enhancement of reliability as well as deterrence, and that Reed falls between the extremes defined in Burstein.
We are persuaded that the Moran rule, i.e., the "old rule," does not substantially impair the reliability of the factfinding process. *401 We note that Reed determined that the police behavior at issue rendered ineffective defendant's waiver of the privilege against self-incrimination. The Court did not determine that it rendered defendant's statement involuntary. Some potential for impairment of the reliability of a defendant's statement is present under Moran. As Justice Handler observed, the Reed rule is designed to counteract "the inherent coercive pressures of custodial interrogation" 133 N.J. at 260, 627 A.2d 630. However, this concern regarding the reliability of an inculpatory statement harvested from a custodial setting, though genuine, is general and is applicable to any statement made during custodial police interrogation.
As Burstein points out, one of the considerations in retroactivity analysis is "whether the defendant had alternate ways of contesting the integrity of the evidence being introduced against him." 85 N.J. at 408, 427 A.2d 525. One of those alternatives is to test the voluntariness of a defendant's statement. In applying that test, police failure to inform a defendant that a lawyer is attempting to contact him is a factor to be considered in determining the voluntariness of a statement. See Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521 (1963) (voluntariness of confession can be determined only by an examination of all of the attendant circumstances); State v. Hampton, 61 N.J. 250, 272, 294 A.2d 23 (1972) (court must decide in first instance whether, considering all circumstances, confession was given voluntarily).
We must now balance the countervailing considerations of state reliance on the old rule and potential disruption to the administration of justice, against the extent to which the old rule impaired the reliability of the factfinding process.
We infer that retroactive application of Reed would be somewhat disruptive to the administration of justice. Although we do not know the number of pending and previously resolved cases involving police deflection of a lawyer's attempt to contact a suspect in custody, we do know that the issue is raised frequently. See the cases cited in Reed, supra, 133 N.J. at 248-49, 627 A.2d *402 630. We are aware of at least two other appeals involving Reed issues pending in this court.
Additionally, we are persuaded that the reliance of law enforcement personnel on Moran is a powerful countervailing consideration. The United States Supreme Court decided Moran after we decided Elmore, and Moran eroded Elmore's foundation. Thus, when the police interrogated Abronski, Moran represented the applicable law and the police justifiably relied on and followed it. Court pronouncements regarding police conduct serve the purpose of protecting defendant's rights by defining for the police what is acceptable and not acceptable. See State v. Hartley, supra, 103 N.J. at 267-68, 287, 511 A.2d 80. Our decisions are supposed to be followed by law enforcement officers and are expected to modify their conduct in the streets and in the station houses. We expect the police to make a good faith effort to apply those rules and deport themselves appropriately. We are persuaded that retroactive application of Reed would tend to sow confusion and undercut that expectation.
We conclude, therefore, that the factors of reliance and disruption substantially outweigh any general potential of the "old rule," i.e., Moran, to impair the reliability of the factfinding process, and we conclude that Reed is not to be applied retroactively.
Defendant raises several other issues which we determine to be without merit. The court stenographer lost her notes of the final day of the suppression hearing during which defendant and his mother testified and Judge Palese, who is now retired, rendered his ruling upholding the admissibility of defendant's statement. After defendant filed his notice of appeal, we granted defendant's motion for a limited remand to the trial court to reconstruct those proceedings in accord with R. 2:5-3(f). A reconstruction hearing was held before Judge Steinberg pursuant to our order.
The incomplete record of the suppression hearing is related to defendant's contentions (1) that he exercised his right to *403 counsel and the right to remain silent when, in the presence of the arresting police officers, he allegedly asked his mother to call a lawyer; and (2) that the inadequacy of the reconstructed record violates his right to due process. Regarding the first contention, the arresting police officers testified that they heard no such request. Although the record is incomplete regarding the motion judge's findings, it is clear from the circumstances and context of the suppression motion that he found the officers' testimony to be credible.
Regarding the second contention, we perceive no due process violation. Defendant does not claim prejudice from the loss of his or his mother's testimony, but rather, claims prejudice as the result of the loss of the trial judge's findings. The core issue before us is whether defendant's waiver of his privilege against self-incrimination was effective in light of the deflection by the police of a lawyer's attempt to contact defendant. The facts regarding that issue were not contested and the issue is determined based on the retroactivity or nonretroactivity of Reed. The other issue, whether defendant requested a lawyer, was obviously determined in the State's favor based on the credibility of the police officers.
Defendant contends that the State's expert witness improperly bolstered J.R.'s credibility when she gave her opinion regarding the credibility and trustworthiness of children's statements regarding sexual abuse. Not so. The expert merely made generalized statements regarding behavior often found in sexually abused children and did not render an opinion regarding J.R.'s credibility or truthfulness. The expert's testimony comported with State v. J.Q., 130 N.J. 554, 617 A.2d 1196 (1993).
Defendant's final contention, that the record does not support a fifteen year sentence, is clearly without merit. R. 2:11-3(e)(2).
Affirmed.
NOTES
[1] In cases involving federal constitutional rights, the retroactivity analysis is different. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); State v. Harvey, 121 N.J. 407, 422-23, 581 A.2d 483 (1990), cert. denied, 499 U.S. 931, 111 S.Ct. 1336, 113 L.Ed.2d 268 (1991).