283 N.J. Super. 98 (1995)
661 A.2d 298
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CURTIS KNIGHT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 16, 1995.
Decided June 15, 1995.
*101 Before Judges LANDAU, CONLEY and NEWMAN.
Virginia C. Saunders, Assistant Deputy Public Defender, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Ms. Saunders, of counsel and on the brief).
Maryann K. Lynch, Assistant Essex County Prosecutor, argued the cause for respondent (Clifford J. Minor, Essex County Prosecutor, attorney; Ms. Lynch, of counsel and on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Following a jury trial, defendant was convicted of first degree murder, N.J.S.A. 2C:11-3a(1), (2) (count one); fourth degree unlawful possession of a weapon, N.J.S.A. 2C:39-5d (count two); and third degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d (count three). His co-defendant was acquitted of all three counts. Counts two and three were merged into count one and a life term of imprisonment with a 30 year parole disqualifier was imposed. Because we are of the view that State v. Sanchez, 129 N.J. 261, 609 A.2d 400 (1992), precludes the admission of defendant's statement and further that in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 *102 (1963), certain material information was not disclosed by the prosecutor, we reverse.
The record is fairly extensive. We will not recite it at length, but only refer to the evidence that is relevant for our disposition of the appeal. The State's theory was that defendant, along with co-defendant Caesar Glenn, and another individual who was never identified, bludgeoned Glenn Brown on the morning of September 12, 1988 with a metal pipe. Mr. Brown died two days later. An indictment for the murder was returned against defendant in March 1989.
The State produced one eyewitness to the assault, Marie Robinson. There were at least two other witnesses, Betty Shells and Dwight Goines, neither of whom identified defendant as the perpetrator. Marie Robinson did not come forward as a witness until September 23, 1988, eleven days after the assault. Her initial disclosure occurred in a conversation with a probation officer. That conversation occurred during the preparation of a presentence report on a drug possession charge that she had pled guilty to in August 1988, and for which she was then pending sentence. The terms of the plea were fairly favorable  a dismissal of possession with intent to distribute and any custodial term not to exceed 364 days jail time as a condition of probation. During the plea proceeding, however, the trial judge cautioned:
And let me emphasize that (1) When I have to make up my mind whether to accept this Plea that is go along with it, what sentence I should impose, do I give you straight probation or do I give you probation where you do 364 days in jail is going to depend in large part on what I come to learn about you when I read that report so it seems to me that it's in your best interest to tell the Probation Officer everything you want me to know about you as of a positive nature that will help me decide what should be done in this case.

[Emphasis added].
It was following this caution that Robinson disclosed to the prosecutor that she saw defendant hit Brown on the head with a metal pipe.
During her trial testimony, Robinson essentially related that between 7:00 a.m. and 8:00 a.m. on September 12, 1988, she was *103 inside 254 Prince Street in Newark where she saw the victim whom she knew. He was sitting on the back stairs sleeping or "nodding." She could not fully wake him; he seemed "high" and told her that he had been up for four days, was running from people and could not go home because of all the "dirt" he had done. She left him in the hallway and went outside to the front of the building where she hung out with two other women, Hakima (later identified as Kim Loyal) and Ms. Mohamid, for 15 or 20 minutes. She saw two other men enter the hallway of the building from the back and take Brown by the arm towards a back porch. She saw defendant follow them out. She went back inside the building to see what they were doing and saw defendant hit Brown from behind with a metal pipe.
Robinson's credibility was not without question. There were substantial discrepancies between her trial testimony and the statement she gave to the police. There were discrepancies between her direct testimony and testimony on cross examination. And she admitted having pending charges at the time she first came forward to help the police solve the murder. Moreover, the medical evidence concerning the nature and location of Brown's injuries was such that it raised questions as to whether Robinson's description of how defendant had hit the victim was consistent with the actual injuries.
Further, the testimony of Dwight Goines, produced by defendant, was not consistent with Robinson's version. He was employed by the Newark Housing Authority and was the cousin of the victim. At 8:15 a.m. on the morning of the assault, he was painting inside 254 Prince Street, a building owned by the Housing Authority. He saw Brown in the hallway. They talked for a few minutes and Brown went out towards the back porch while Goines went out to the front of the building. About five minutes later, Goines heard a gun shot. When he ran to the back, he found Brown lying on the back porch. At no time did he see either defendant or Robinson. He saw two men run off but could not identify either.
*104 The State also presented evidence of a Pepsi-Cola baseball cap found at the scene. Robinson testified that a year before the murder she had seen defendant wearing a Pepsi-Cola cap. In addition, the operations manager for Pepsi-Cola testified that defendant had worked at a Pepsi-Cola plant from 1984 to 1987 and that the baseball caps were given out each year to the employees. Neither Robinson nor Goines nor anyone else, however, identified any of the perpetrators as wearing such a cap. The cap, moreover, was never retained, apparently having been sent to the hospital with the victim because the police initially thought it was his. It was never examined for hair samples or any other identifying evidence.
The other evidence inculpating defendant was a metal pipe found in his girlfriend's car when he was apprehended in California by federal agents on a fugitive warrant almost a year after the killing. Robinson testified that the pipe looked like the one she had seen defendant use. There were, however, no particular identifying features or any other attributes of the pipe that would distinguish it from any other metal pipe. Defendant's girlfriend testified that she had picked the pipe up while jogging to ward off some dogs and then put it in her car.
On October 25, 1989, Special Agent Wilson arrested defendant at 8:35 a.m. on a federal fugitive warrant arising from the New Jersey murder indictment. At 4:14 p.m. the same day, defendant was advised of his Miranda[1] rights and questioned by Wilson. Wilson initially denied that he knew any details about the New Jersey charges or that he had had any contact with New Jersey officials prior to questioning defendant. He admitted, however, that his involvement with defendant was not just for the federal warrant, but rather was in connection with the State indictment and that before questioning defendant he had spoken to a Detective Allerton, a New Jersey officer, who told him defendant was wanted for murder and that it involved a beating. During a *105 subsequent Brady hearing, it turned out that, in addition, Wilson also had seen an F.B.I. teletype from the F.B.I. Newark office which contained the following information:
Re Newark telephone call of SA Ron Butkiewicz with SA Ralph DiFonzo, Los Angeles Division, 9/27/89.
On Monday, September 12, 1988 at approximately 8:45 a.m. an individual named Glenn Brown was assaulted at the rear of 254 Prince Street, Newark, New Jersey. Brown was struck several times on the head with a bludgeon and left unconscious. On September 14, 1988, Brown died of the injuries sustained during the assault on him occurring on September 12, 1988.
Subsequent investigation resulted in the arrest of co-defendant Caesar Glenn and the identification of Curtis Knight as being involved in the murder of Glenn Brown.
Curtis Knight was indicted for homicide during March, 1989, by an Essex County, New Jersey grand jury.
On 5/17/89, an unlawful flight warrant was obtained on Knight before United States Magistrate G. Donald Haneke at Newark, New Jersey. Recommended bail on Knight is one hundred thousand dollars ($100,000.00) cash.
On 9/27/89, Detective Michael Stigliano, Essex County Prosecutor's Office, Newark, New Jersey, contacted case agent in this matter and provided information relative to a possible location for Curtis Knight. Stigliano advised that he had checked the last known address of Knight in Belleville, New Jersey, and determined that Knight had been living at that location with a girlfriend, Cathy Capella, a white female, not further identified. Knight and Capella have a child who was born in approximately September, 1987: sex of the child is unknown. As part of their tenant application, a credit check was required and Capella provided a Master Card Credit Card number. Stigliano established contact with appropriate authorities at Master Card and determined that the Master Card and number assigned to Capella had been used as recently as August 9, 1989, in her name and that the address associated with the use of the card on that date was 3446 Bromley Court, Palmdale, California, 93651. Telephone number (805) 266-0254.
Additionally, it is known that Knight has a brother, George Knight (FBI Number 93568R4). George Knight has two prior known addresses in California, the first being 1617 South Saint Andrew's, Los Angeles, California, and the second 11122 Exposition Boulevard, Los Angeles, California.
The teletype included a detailed description of defendant, including his social security number, New Jersey driver's license number and F.B.I. number, and set forth the following instructions:
Los Angeles, at Palmdale, California: Conduct discreet investigation at 3446 Bromley Court, in order to assess likelihood of subject Knight currently being at that address. Conduct logical follow-up investigation to locate and apprehend.

At Los Angeles, California: Conduct logical fugitive investigation at 1617 South Saint Andrew's and 11122 Exposition Boulevard, both addresses known to have *106 been previously utilized by subject's brother, George Knight, FBI Number 93568R4.

Newark will attempt to facsimile photograph of Knight to Los Angeles, and will forward mug shot of Knight to Los Angeles by overnight mail.
Newark maintaining liaison with Detective Stigliano, Essex County Prosecutor's Office.
[Emphasis added].
It is clear that the purpose of Wilson's interrogation was to obtain information about the murder from defendant for the New Jersey authorities, and that Wilson was fully filled in on the details. Indeed, Wilson conceded that his instructions were to question defendant about the murder and see "if he wanted to talk to us."
Defendant was by then under indictment, a fact Wilson knew through the teletype. No separate warnings, apart from the Miranda rights, concerning his right to counsel were given.
Through the interrogation process, the following information was obtained. Defendant told Wilson that he knew nothing of the outstanding warrant, and had lived in California for about a year. He said that prior to leaving New Jersey someone had told him that there was a contract out for him for beating up "this guy" and that the man's friends were looking for defendant. Defendant related that he had been robbed in New Jersey by someone he had not recognized, but that other people had told him "it was a guy named Hassan[2]." Defendant left New Jersey because he had heard the person looking for him was part of a gang, and defendant was concerned for his family's safety. This statement provided a basis for the prosecutor's claim of flight as well as the alleged motive for the killing, that defendant had been robbed by the victim.
Following defendant's conviction, a hearing was held on a motion for new trial based upon newly discovered evidence consisting of another eyewitness who had not come forward until after defendant's conviction. The witness was a friend of both the victim and defendant. He said he had been at the scene and saw *107 Brown being beaten. The assailant was not defendant. This witness's credibility, however, was sharply challenged by the prosecutor and the trial judge concluded that his testimony would not have made a difference in the verdict. The motion was denied. Defendant appealed.
While the appeal was pending, various applications were made concerning other discovered evidence and we ultimately remanded the matter to the trial judge for the creation of a record and findings of facts concerning the following alleged Brady violations:
(a) failure to disclose that Robinson's cooperation in the initial stages of this matter was brought to the attention of her sentencing judge, particularly in light of prosecutor's comments as to Robinson in summation; (b) failure to disclose promise of leniency in sentencing of Terrence Worthy, and facts which might furnish basis for a finding that Worthy had a motive to fix blame upon defendant; (c) failure to disclose full extent of information provided to F.B.I. in connection with execution of fugitive warrant for Knight; (d) failure to disclose that "Hakima" was Kim Royal (sic) or Kim Loyal, and that she had given a statement which conflicted with Robinson's testimony as to persons present at the scene of the murder.
The Robinson sentencing material that we referred to in our remand order consisted of a sealed portion of her sentencing proceeding during which an investigator from the Prosecutor's Office, who was involved in defendant's prosecution, spoke favorably on her behalf, advising the trial judge that her cooperation had led to the warrant for the arrest of defendant. Following this sealed statement, the sentence that was imposed was time served plus a small fine whereas the plea agreement was for probation with a 364-day jail condition.
The Worthy material was two-fold. Critical to our concern here is not the sentencing information, for it appears that defense counsel, at least co-defense counsel, was aware of that information. We focus, rather, on a statement Worthy gave in connection with the murder of a Benjamin Levine. In that statement Worthy implicated the victim as a participant in the Levine murder. The statement was given prior to the time that Brown was killed and while Worthy had other charges pending.
As to the "Hakima" or Kim Loyal information, she gave an oral statement to one of the investigating officers shortly after the *108 murder that she had been on the scene and did not see Robinson. Although her name was on the prosecutor's witness list, albeit as Kim "Royal", the content of her oral statement was not conveyed to defense counsel.
Following three days of testimony on the remand, the trial judge concluded that the Robinson sealed transcript was improperly withheld, but that it was not material. As to the Worthy sentencing material and the F.B.I. teletype, the contents of which we have previously quoted, there was no finding as to whether the prosecutor withheld that information. The trial judge did, however, conclude that the allegedly withheld information was not material. No reference was made to the nondisclosure of Worthy's statements given in connection with the Levine murder. As to the Kim Loyal issue, the trial judge found a failure to disclose, but concluded the nondisclosure was not material. Finally, with respect to all of the information that the trial judge found had not been disclosed, no findings were made as to whether the nondisclosure was intentional and whether it was of information that defense counsel had specifically requested. See State v. Landano, 271 N.J. Super. 1, 32, 637 A.2d 1270 (App.Div.), certif. denied, 137 N.J. 164, 644 A.2d 612 (1994), discussing that distinction in the context of a Brady violation and its consequences.
On appeal, defendant contends:
POINT I: A REVERSAL OF DEFENDANT'S CONVICTION IS REQUIRED BY STATE V. SANCHEZ BECAUSE THE ARRESTING OFFICER INITIATED A CONVERSATION WITH DEFENDANT AND TOOK A STATEMENT, AFTER HIS INDICTMENT AND WITHOUT COUNSEL'S CONSENT, IN VIOLATION OF HIS RIGHT TO COUNSEL UNDER THE NEW JERSEY CONSTITUTION, ART. I, PAR. 10. (Not Raised Below)
POINT II: THE PROSECUTOR'S BEHAVIOR THROUGHOUT THE TRIAL WAS SO CLEARLY OUTSIDE THE BOUNDS OF APPROPRIATE CONDUCT THAT IT VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL UNDER THE CONSTITUTIONS OF THE UNITED STATES AND NEW JERSEY (U.S. CONST., AMENDS. VI AND XIV, N.J. CONST. (1947), ART. 1, PAR. 10). (Partially Raised Below)
A. This Court Should Reverse Defendant's Conviction, Or In The Alternative, Remand to Determine Whether The Prosecutor's Illness, Which Stopped The Trial Before A Defense Witness Testified, Was Legitimate Or Merely A *109 Pretext Which Gave The Prosecutor Time To Find The Witness And Prepare His Testimony, And To Determine Whether The Prosecutor Suborned Perjury.
B. This Court Should Either Reverse For Prosecutorial Misconduct Or Remand This Case To The Trial Court To Expand The Record On The Issue Of Whether The Prosecutor Promised Marie Robinson Some Unrevealed Benefit In Exchange For Her Testimony Against Defendant Which Was Reflected By The Sealed Record.
C. The Prosecutor Hid Discoverable Information Regarding State's Witness Terrence Worthy's Involvement In Another Murder With The Murder Victim.
D. The Prosecutor Hid Discoverable Photographs From The Defense In Order To Surprise The Defense With A Damaging Piece of Circumstantial Evidence It Could Not Counter On Short Notice.
E. The Prosecutor's Summation Was So Filled With Remarks Not Based On The Evidence, Remarks Designed To Bolster The Eyewitness's Testimony, And Statements Conveying His Belief In the Defendant's Guilt That Defendant Was Deprived of a Fair Trial.
1. The Prosecutor Exceeded The Bounds Of Proper Comment On The Evidence By Telling The Jury Things Not In Evidence. (Not Raised Below).
2. The Prosecutor Repeatedly Expressed To The Jury His Belief That Defendant Is Guilty, That Defendant's Witnesses Lied, And That Defense Counsel Had Tried To Mislead Them.
3. This Court Should Reverse This Case Because The Prosecutor Improperly Bolstered Marie Robinson's Testimony By Lauding Her Courage And Honesty And By Stressing That She Had Nothing To Gain By Testifying Against Defendant When In Fact The Sealed Record In Her Controlled Dangerous Substance Conviction Must Have Contained A Promise Of Beneficial Treatment In Exchange For Her Testimony Against Defendant Since Her Sentencing Judge Found On The Record That She Had Cooperated With Authorities.
4. The Prosecutor's Comments On Other Facts No In Evidence Had A Clear Capacity To Confuse The Jury And Cause The Jurors To Confuse Evidence With What The Prosecutor Told Them The Evidence Showed. (Not Raised below).
F. At Defendant's Motion For A New Trial Based On Newly Discovered Evidence, The Prosecutor Argued That The Witness Kenneth Barnhill Could Not Have Seen All That He Said He Saw, Knowing This To Be False Since The State's Eyewitness Marie Robinson Had Testified That She Saw Everything From The Same Vantage Point As Barnhill. (Not Raised Below).
POINT III: THE ADMISSION OF THE CO-DEFENDANT'S CONFESSION IN WHICH DEFENDANT'S IDENTITY WAS NOT EFFECTIVELY DELETED, DENIED DEFENDANT HIS SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES AGAINST HIM SINCE HIS CO-DEFENDANT DID NOT TAKE THE STAND. U.S. CONST. AMEND. XI; N.J. CONST. OF 1947, ART., 1, PAR. 10. (Not Raised Below).

*110 POINT IV: IT WAS IMPROPER AND HIGHLY PREJUDICIAL FOR THE JUDGE TO CHARGE THE JURY THAT IT COULD CONSIDER THE EVIDENCE OF DEFENDANT'S FLIGHT AS PROOF OF CONSCIOUSNESS OF GUILT AND VIOLATES DEFENDANT'S RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES CONSTITUTION, AMENDS., VI AND XIV, AND THE CONSTITUTION OF NEW JERSEY (1947), ART. 1, PAR. 10. (Partially Raised Below).
POINT V: THE ADMISSION OF THE PIPE INTO EVIDENCE WAS ERROR; MOREOVER, THE COURT'S REFUSAL TO ALLOW DEFENSE COUNSEL TO COMMENT ON THE STATE'S FAILURE TO CONNECT THE PIPE TO THE MURDER, AND THE COURT'S FAILURE TO CHARGE THE JURY THAT THE PIPE HAD NOT BEEN PROVED TO BE THE MURDER WEAPON AND WAS BEING ADMITTED SOLELY A AN INSTRUMENT IDENTIFIED BY A WITNESS AS "LOOKING LIKE" THE MURDER WEAPON DENIED DEFENDANT A FAIR TRIAL AND CONSTITUTED REVERSIBLE ERROR. U.S. CONSTITUTION, AMENDS. VI AND XIV; NEW JERSEY CONSTITUTION OF 1947, ART. 1, PAR. 10.
POINT VI: THIS COURT SHOULD REMAND THIS CASE TO THE TRIAL COURT FOR A HEARING TO DETERMINE WHETHER DEFENSE COUNSEL'S REPRESENTATION WAS INEFFECTIVE FOR FAILURE TO INVESTIGATE WITNESSES AND FOR FAILURE TO PROVIDE DEFENDANT WITH A DEFENSE IN VIOLATION OF HIS RIGHT TO COUNSEL UNDER THE U.S. CONSTITUTION, AMENDS. VI AND XIV AND THE N.J. CONSTITUTION, ART. 1, PAR. 10.
POINT VII: DEFENDANT SHOULD BE GRANTED A NEW TRIAL BECAUSE OF THE CUMULATIVE EFFECT OF THE NUMEROUS TRIAL ERRORS. (Not Raised Below).
POINT VIII: THE TRIAL COURT ERRED IN ITS WEIGHING OF THE OF THE AGGRAVATING AND MITIGATING FACTORS RESULTING IN THE IMPOSITION OF A SENTENCE THAT IS EXCESSIVE.
Following our remand, defendant contends:
POINT I: THE RULING BELOW THAT THE PROSECUTOR'S BRADY VIOLATIONS WERE NOT MATERIAL WAS ERRONEOUS BECAUSE THE VIOLATIONS CUMULATIVELY CREATED A REASONABLE PROBABILITY THAT HAD THE EVIDENCE BEEN DISCLOSED TO THE DEFENSE, THE RESULT OF THE PROCEEDINGS WOULD HAVE BEEN DIFFERENT, AND THEREFORE VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS. (U.S. CONST., AMENDS. VI AND XIV; NEW JERSEY CONST. OF 1947, ART. 1, PAR. 10).
A. Marie Robinson's Undisclosed Cooperation.
B. Failure to Disclose The Promise Of Leniency In Sentencing Of Terrence Worthy And Facts Which Furnish A Basis For A Finding That Worthy Had A Motive To Fix Blame Upon Defendant.

*111 C. The Failure To Disclose The Full Extent Of The Information Provided To The FBI In Connection With Execution Of The Fugitive Warrant For Knight.
D. The State's Failure To Reveal To The Defense That "Hakima" Was Kim Loyal Who Had Said She Was Not With Marie Robinson On The Morning Of Glenn Brown's Beating.
We have carefully considered the entire record in this matter, including all of the trial transcripts, the remand transcripts, the appendices, briefs and arguments. We are convinced there is substantial merit to Point I of defendant's main brief and his Brady contentions concerning Robinson, Worthy and Loyal. Since a reversal is required on those grounds, we need not address defendant's claims of prosecutorial misconduct, error in the admission of co-defendant's statement (since co-defendant was acquitted, that statement should not be a part of the retrial), or defendant's sentencing claims. We are sure that any prosecutorial excess, for there was some, will not be repeated.
We briefly address those additional issues that might arise on retrial. We find no merit to the flight contention insofar as it was based upon the evidence presented during that trial. A substantial basis, however, for the charge was defendant's statement. Since we conclude in this opinion that this statement can not be used on retrial, the issue of a flight charge should be reconsidered in that light. Further, we urge the trial judge to consider crafting a limiting instruction that includes a reference to "mere departure." See State v. Long, 119 N.J. 439, 499, 575 A.2d 435 (1990). As to the admissibility of the pipe, we previously decided that on the State's interlocutory appeal and will not revisit that determination.
We address, then, defendant's Sanchez and Brady claims, in that order.

I
In State v. Sanchez, 129 N.J. 261, 609 A.2d 400 (1992), the Supreme Court held inadmissible an uncounselled, post-indictment statement of a defendant, despite a voluntary, knowing waiver of Miranda rights. Noting our longstanding adherence to the view *112 that the Sixth Amendment is more demanding than the Fifth Amendment, 129 N.J. at 273, 609 A.2d 400, and the historical guarantee of the right to counsel under our State constitution, 129 N.J. at 274, 609 A.2d 400, the Court held:
The return of an indictment transforms the relationship between the State and the defendant. By obtaining the indictment, the State represents that it has sufficient evidence to establish a prima facie case. Once the indictment is returned, the State is committed to prosecute the defendant. From that moment, if not before, the prosecutor and the defendant are adversaries. Questioning the accused can be only `for the purpose of buttressing ... a prima facie case' ... The spotlight is on the accused. Under those circumstances, the perfunctory recitation of the right to counsel and to remain silent may not provide the defendant with sufficient information to make a knowing and intelligent waiver.... Such a recitation does not tell the defendant the nature of the charges, the dangers of self-representation, or the steps counsel might take to protect the defendant's interest.... Given the adversarial nature of their relationship, for the State's representatives to communicate adequately that information to an indicted defendant would be difficult, nigh to impossible. As a general rule, after an indictment and before arraignment, prosecutors or their representatives should not initiate a conversation with defendants without the consent of defense counsel.

[129 N.J. at 276-77, 609 A.2d 400 (citations omitted and emphasis added)].
See State v. Watkins, 260 N.J. Super. 549, 617 A.2d 281 (App.Div. 1992).
This result was not viewed by the Court as expressive of a new rule, either under state law or federal. See 129 N.J. at 264-266, 609 A.2d 400. Because, however, the United States Supreme Court appeared to have diverted from its "previous bright-line rules protecting individual's Sixth Amendment right to counsel", 129 N.J. at 269, 609 A.2d 400, in Patterson v. Illinois, 487 U.S. 285, 290-91, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261, 271 (1988), Sanchez was decided under Art. 1, para. 10 of the New Jersey Constitution. 129 N.J. at 275-76, 609 A.2d 400.
Sanchez was decided after the trial in this matter and during the pendency of the appeal. We must, therefore, determine whether Sanchez applies. The threshold question in determining retroactivity is always whether a new rule of law has actually been announced. If not, the case law applies. If so, then a weighing analysis must be engaged in. It is only then that the purpose of the new rule, reliance upon the old rule and the impact *113 upon the administration of justice must be considered. State v. Burstein, 85 N.J. 394, 403, 406, 427 A.2d 525 (1981); State v. Abronski, 281 N.J. Super. 390, 396, 657 A.2d 1224 (App.Div. 1995).
Sanchez was not a break with prior law, either State or federal, but rather a continuation of traditional adherence to a heightened importance of the right to counsel once the criminal adversarial process has begun. Sanchez was necessitated only because of the break in that tradition that Patterson was thought to represent.[3]Compare State v. Abronski, supra, at 399, 657 A.2d 1224. In Abronski we considered the retroactivity of the rule announced in State v. Reed, 133 N.J. 237, 627 A.2d 630 (1993), that where the police know an attorney for defendant is present and available and who wants to speak to the defendant, they must so inform the defendant before continuing the interrogation. Critical to our analysis was the express acknowledgement by the Supreme Court in Reed that it was announcing a new rule. No similar pronouncement appears in Sanchez. To the contrary, the clear thrust of the opinion is that it does no more than recognize well established Fifth Amendment and Sixth Amendment differences in the context of the right to counsel. We conclude that Sanchez does not express a new rule and is applicable. Cf. State v. Tucker, 137 N.J. *114 259, 286-91, 645 A.2d 111 (1994) cert. denied ___ U.S. ___, 115 S.Ct. 751, 130 L.Ed.2d 651 (1995) (discussing application of Sanchez to a 1987 confession and concluding it did not apply but for reasons other than nonretroactivity). Moreover, Sanchez was decided while this appeal was pending. See State v. Stever, 107 N.J. 543, 551-52, 527 A.2d 408, cert. denied, 484 U.S. 954, 108 S.Ct. 348, 98 L.Ed.2d 373 (1987).
At the time of his statement, defendant was under indictment and was uncounselled. The only warnings he received and waived were his Fifth Amendment Miranda rights. That was not enough under Sanchez.
The State contends, however, that because no State law enforcement officials were involved, the actions of F.B.I. Special Agent Wilson and admissibility of the evidence he obtained must be viewed under then existing federal law. See State v. Mollica, 114 N.J. 329, 357, 554 A.2d 1315 (1989) (New Jersey constitutional protections against searches and seizures do not govern the legality of federal agents' searches and seizures so long as the agents' conduct is pursuant to federal authority and consistent with federal law). At the time Wilson obtained defendant's statement, Patterson was the governing federal law and the statement would thus be admissible.
The critical factor, however, to Mollica's holding that "federal officers acting lawfully and in conformity to federal authority are unconstrained by the State Constitution," is the nature of the relationship between the officers participating in obtaining the evidence and the officers seeking to make use of such evidence. 114 N.J. at 355, 554 A.2d 1315. "The salient factor continues to be agency vel non between the officers of the respective jurisdictions." 114 N.J. at 351, 554 A.2d 1315. Thus, the Supreme Court cautioned that its holding in Mollica was restricted by "a vital, significant condition." 114 N.J. at 355, 554 A.2d 1315. When evidence obtained by a federal official is sought to be used by state officials, "it is essential that the federal action deemed lawful under federal standards not be alloyed by any state *115 action or responsibility." Id. A critical determination, therefore, is "whether in any legally significant degree the federal action can and should be considered state action." Id. As the Supreme Court observed:
This case thus requires us to consider the implications of the silver platter doctrine and its key element: intergovernmental agency. An important aspect of this determination is whether for constitutional purposes the federal agents can be said to be acting under the "color of state law." The assessment of the agency issue necessarily requires an examination of the entire relationship between the two sets of government actors no matter how obvious or obscure, plain or subtle, brief or prolonged their interactions may be. The reasons and the motives for making any search must be examined as well as the actions taken by the respective officers and the process used to [obtain the evidence].... Differing relationships and interactions may suffice to establish agency. Thus, antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of State law. On the other hand, mere contact, awareness of ongoing investigations, or the exchange of information may not transmute the relationship into one of agency. ..."
[114 N.J. at 355-56, 554 A.2d 1315 (emphasis added)].
In essence, in order to avoid the strictures of state constitutional protections, federal agents when obtaining evidence sought to be used in a state action must have "acted independently and without cooperation or assistance of our own state officers." 114 N.J. at 358, 554 A.2d 1315. "[T]he court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods." Stonehill v. United States, 405 F.2d 738, 744 (9th Cir.1968), cert. denied, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969) (quoting Byars v. United States, 273 U.S. 28, 32, 47 S.Ct. 248, 249, 71 L.Ed. 520 (1927)).
To be sure, mere transfer of information or notification of the potential existence of a criminal in another's jurisdiction will not establish an agency relationship. United States v. Heller, 625 F.2d 594 (5th Cir.1980) (tip by American official did not create agency relationship); United States v. Derewal, 703 F. Supp. 372 (E.D.Pa.), aff'd 887 F.2d 263 (3rd Cir.1989), cert. denied, 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 954 (1990) (merely supplying tip to foreign law enforcement agency which then conducted an *116 investigation and search leading to an American prosecution did not create joint venture). See Alvarado v. State, 853 S.W.2d 17 (Tex. Crim. App. 1993) ("the term `agency' denotes a consensual relationship existing between two persons, by virtue of which one of them is to act for and on behalf of the other," 853 S.W.2d at 22, but no such agency arises where Mexican officials arrest defendant on Texas warrant and obtain a confession without involvement or request of Texas official but solely pursuant to Mexican procedure); State v. Gwinner, 59 Wash. App. 119, 796 P.2d 728 (Ct.App. 1990) (state officer conveyed an informant tip to DEA, DEA conducted search of defendant's vehicle and drugs obtained can be used in state prosecution because there was no evidence that state officer requested that vehicle be searched or had knowledge that it was being searched). Accord Dillon v. State, 844 S.W.2d 139 (Tenn. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1589, 123 L.Ed.2d 155 (1993).
On the other hand, a formal agency relationship is not required. If under all the circumstances federal agents act with cooperation and assistance of state officials, such a relationship will be found to exist. State v. Johnson, 75 Wash. App. 692, 879 P.2d 984 (Ct.App. 1994) (state officer gave DEA directions and address to defendant's location, assisted in investigation and execution of warrant); United States v. Emery, 591 F.2d 1266, 1268 (9th Cir.1978) (DEA and Mexican authorities carried out a coordinated drug surveillance and drug arrest). "If a purpose of the investigation is for a State prosecution, the federal agents can, in effect, be deemed agents of the State prosecutors...." State v. Minter, 116 N.J. 269, 283, 561 A.2d 570 (1989). And see Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1948).
In Lustig a federal agent was notified by local police of a possible counterfeiting operation. He investigated, found no evidence thereof but advised the local police that he thought "something was going on." The local police obtained and executed on a warrant later determined to be violative of the Fourth Amendment. The federal agent did not participate but remained at local *117 police station because he "was curious to see what they did find." Evidence of counterfeiting was obtained and turned over to federal agent. The United States Supreme Court concluded that the evidence could not be used in a subsequent federal prosecution because of the agent's involvement in the illegal search conducted by the local police. Conceding that the federal agent had not requested the search and was not the moving force and further conceding that the search was not undertaken to assist in enforcement of a federal law, Justice Frankfurter nonetheless observed:

a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter. The decisive factor in determining the applicability of the Byars Case is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers.
[338 U.S. at 78-79, 69 S.Ct. at 1374, 93 L.Ed. at 1823 (emphasis added)].
Just as "a search is a search by a Federal official if he had a hand in it," Mollica indicates that so too is a search a search by State officials if they "had a hand in it."
The State contends that Special Agent Wilson was doing no more than executing and acting on the federal fugitive warrant. This is disingenuous at best. Our review of the trial transcript, coupled with the information provided in the F.B.I. teletype and agent Wilson's subsequent Brady hearing testimony, leads us to the inescapable conclusion that his focus was not solely the federal warrant. And there is nothing equivocal about his testimony that he wanted to talk to defendant in connection with the murder charge. This was no "mere contact, awareness of ongoing investigation, or exchange of information." Rather, it was clearly a joint, cooperative effort to arrest defendant and interrogate him on the State murder charges and obtain evidence thereon. Though reluctant to acknowledge any contact with State officials or awareness of the State charge before questioning defendant, Wilson *118 acknowledged that he had talked to at least one State official and knew a fair amount of the details of the murder. Wilson ultimately admitted receipt of the Newark F.B.I. teletype which directs various tasks to be performed by F.B.I. agents in connection with the New Jersey indictment and expressly establishes a liaison relationship between the F.B.I. and the prosecutor's office. Agent Wilson's task when interrogating defendant was to get him to talk about the murder charges "if he wanted to talk to us." Those murder charges are not federal offenses and Wilson's role in obtaining evidence from defendant thereon was clearly not independent of State involvement.
We recognize that this issue was not considered by the trial judge and "pose[s] a fact-sensitive exploration," Mollica, 114 N.J. at 357, 554 A.2d 1315. We, ordinarily, would remand for an initial analysis by the trial judge and for an additional evidential hearing, see 114 N.J. at 357, 554 A.2d 1315. But we see no purpose to be served in doing so now, almost seven years after the murder. The record that we presently have establishes the existence of a joint, cooperative relationship between the F.B.I. and State law enforcement officers for the purposes of arresting and interrogating defendant on the New Jersey charges. See State v. Minter, supra, 116 N.J. at 283, 561 A.2d 570. Under these circumstances, and given our conclusion that Sanchez applies, we hold that defendant's uncounselled, post-indictment statement is inadmissible, despite the waiver of his Miranda rights.[4]
The harm to defendant is substantial and requires a reversal and new trial. As we have pointed out, the evidence of his guilt was less than overwhelming. Although his statement is not a direct confession, at the least it provided the State with a motive not otherwise supplied by any other admissible evidence and *119 further provided a basis for the flight charge.[5] Without defendant's statement, a jury may well have had a reasonable doubt as to his guilt.

II
Our conclusion as to the inadmissibility of defendant's statement under Sanchez may render it unnecessary for us to consider defendant's Brady claims. However, as our reversal rests equally upon these grounds, we briefly address the withheld sentencing information concerning Robinson, the withheld information concerning "Hakima" or Kim Loyal, and the withheld information concerning Worthy's involvement in the Levine murder and his statement in connection therewith.
As we have previously indicated, the trial judge concluded, at least as to Robinson and "Hakima", that favorable information was not disclosed to defense counsel, either purposefully or inadvertently.[6] But he concluded that the nondisclosures were not material.
We have recently addressed the requirement of materiality within the context of Brady violations. State v. Landano, 271 N.J. Super. 1, 32-36, 637 A.2d 1270 (App.Div.), certif. denied, 137 N.J. 164, 644 A.2d 612 (1994). There, after examining the law and noting the difference in the standard of materiality under State law as opposed to federal law, at least where there has been a specific request for the nondisclosed information, compare State v. Marshall, 123 N.J. 1, 199, 586 A.2d 85 (1991) and United States v. *120 Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985), we said:
We take this opportunity to clarify the standard of materiality applicable to cases in which the defense made no request or only a general one for the suppressed evidence. Obviously, New Jersey's standard for determining whether a reversal is required where the prosecutor has withheld exculpatory evidence may not be more stringent than that required by the federal constitution. Candor requires us to admit that we discern little, if any, practical difference in the two standards of materiality. It is difficult for us to envision a case in which there is a reasonable probability that the suppressed evidence would affect the outcome of the trial, but would not create a reasonable doubt that did not otherwise exist. Although the two standards are phrased differently, we find it difficult to imagine a scenario in which one test would yield a reversal, but the other would not. No matter how the test is articulated, the question of whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict.

[271 N.J. Super. at 35-36, 637 A.2d 1270 (emphasis added)].
But we thought the more prudent and better course was to apply Bagley where there either was no request for the withheld information or only a general request. In such cases, reversal would be required "`only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. A reasonable probability is one `sufficient to undermine confidence in the outcome.' Ibid." 271 N.J. Super. at 36, 637 A.2d 1270. We also noted that a trial judge's conclusions as to materiality are mixed fact and law conclusions and, thus, "not entitled to the same degree of deference that is to be accorded its determination of factual issues." 271 N.J. Super. at 36 n. 13, 637 A.2d 1270.
Here, although not addressed below or in the briefs, there appears to have been no specific request or only a general request for the nondisclosed information. The Bagley materiality test, then, is applicable.
As to the Robinson sentencing information, we noted in Landano the importance of such information, observing that "`[e]very fact or circumstance tending to show the jury the witness'[s] relation to the case or the parties is admissible to the end of determining the weight to be given to his evidence.' ... *121 The fact that the witness denies holding any expectancy of leniency is not a proper basis for barring or curtailing non-examination and the subject.... Our Supreme Court has held that prosecutorial suppression of evidence relating to a witness's possible interest constitutes a violation of the defendant's right to due process." 271 N.J. Super. at 41, 637 A.2d 1270. And see State v. Vaccaro, 142 N.J. Super. 167, 176-77, 361 A.2d 47 (App.Div.), certif. denied, 71 N.J. 518, 366 A.2d 674 (1976). To be sure, Robinson denied expecting or receiving any benefit on her pending drug charges in exchange for her statement inculpating defendant. But the simple fact is that she did appear to receive a benefit. Although facing a possibility of probation and 364 days jail time under the plea agreement, all she got was time served and a fine. At the least the jury may well have so concluded had they had the benefit of the contents of the sealed sentencing transcript. We reject, moreover, as in any way dispositive the fact that at the time of her trial testimony, Robinson had already been sentenced on the other charges and thus no longer had any reason for offering an untruthful statement. The statements Robinson gave that led to defendant's arrest and pursuant to which she testified were given under oath. A recanting at the time of trial could well have subjected her to perjury, or so she may have thought.
We view the "Hakima" or Kim Loyal information as also exculpatory and material. According to Robinson, she was with Kim Loyal for 15 to 20 minutes before she went back into building 254. Loyal never saw Robinson on the scene. To be sure, her credibility during the Brady hearing was substantially challenged. But we can not say that, had the jury heard all of the evidence relating thereto, they would have rejected it. In our view, the testimony of Kim Loyal, coupled with Goines' testimony in which he too claimed he never saw Robinson at the time she said she was at 254 Prince Street witnessing the assault, in addition to the contents of the sealed sentencing transcript, raises a reasonable probability that the jury would have reached a different verdict. We have a strong sense that in all probability, the jury would have *122 rejected Robinson's credibility. Without her, the State had very little else.
Finally, we comment on the Worthy statements in connection with the Levine murder and in which he implicated Brown, the victim here. As its significance has been articulated by defense appellate counsel:
Worthy's prior statement to the police against Glenn Brown in the Benjamin Levine murder was evidence of "bad blood" between Worthy and Brown. On one hand, it gave Brown a motive to "get" Worthy for giving evidence against him. On the other hand, if, as Marie Robinson said, Brown "did a lot of dirt" to people, and he was someone "who had shot three or four people in the past or had hurt or killed a few people" and had just recently gotten out of prison then Worthy had a great incentive to "get" Brown before Brown "got" him. This is not a far-fetched scenario in the milieu of drugs and guns in which these two individuals existed. Worthy, having learned from Brown that he had robbed Knight, used Knight's purported motive to point the finger at him to deflect suspicion from himself.
We express no view as to how this might be played out before a jury. At the least, evidence tending to suggest someone else had a motive to kill the victim is highly material. See State v. Landano, 271 N.J. Super. at 38, 637 A.2d 1270.
Reversed and remanded for a new trial consistent with this opinion.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] "Hassan" was Glenn Brown's street name.
[3] Whether Patterson, given its factual context, is truly a break with prior precedent might be questionable. The defendant in Patterson knew of his indictment and in a footnote the United States Supreme Court said "Because, in this case, petitioner concedes that he was so informed ... we do not address the question whether or not an accused must be told that he has been indicted before a postindictment Sixth Amendment waiver will be valid." 487 U.S. at 295 n. 8, 108 S.Ct. at 2396 n. 8, 101 L.Ed.2d at 274 n. 8. But as our Supreme Court observed in Sanchez, "The Court's reservation of that question may be more apparent than real. Patterson's holding is that Miranda warnings adequately alert an accused of the right to counsel and of the consequences of a decision to waive his or her Sixth Amendment rights during post-indictment questioning.... That rationale suggests that nothing more than Miranda warnings are required during post-indictment interrogation for defendants to make a knowing and intelligent waiver of their Sixth Amendment right to counsel. We are left with a feeling of uncertainty whether the factual distinction between Patterson and the present case makes a difference." 129 N.J. at 272-73, 609 A.2d 400.
[4] We do not suggest that Sanchez precludes admissibility where a defendant knowingly waives his Sixth Amendment right to counsel. But to obtain such waiver, more than the Miranda warnings is required. No more was given here.
[5] As we have said, we leave it to the trial judge to reconsider whether a flight charge is warranted.
[6] It may be that the nondisclosure here was more the product of the "right hand not knowing what the left hand is doing." Nonetheless, disclosure obligations pertain. See Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 765-66, 31 L.Ed.2d 104, 108-09 (1972); State v. Landano, 271 N.J. Super. 1, 37-38, 637 A.2d 1270 (App.Div.), certif. denied, 137 N.J. 164, 644 A.2d 612 (1994).