678 A.2d 642

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND
CROSS–RESPONDENT, v. CURTIS KNIGHT, DEFEN-
DANT–RESPONDENT AND CROSS–APPELLANT.

Argued March 25, 1996—Decided July 11, 1996.

234

*Raymond W. Hoffman*, Assistant Prosecutor, argued the cause for appellant and cross-respondent (*Clifford J. Minor*, Essex County Prosecutor, attorney; *Mr. Hoffman* and *Maryann K. Lynch*, Assistant Prosecutor, on the briefs).

*Virginia C. Saunders*, Assistant Deputy Public Defender, argued the cause for respondent and cross-appellant (*Susan L. Reisner*, Public Defender, attorney).

*Debra A. Owens*, Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Deborah T. Poritz*, Attorney General, attorney).

The opinion of the Court was delivered by

STEIN, J.

After a jury trial, defendant, Curtis Knight, was convicted of first-degree murder, third-degree possession of a weapon for an unlawful purpose, and fourth-degree unlawful possession of a weapon. The Appellate Division reversed defendant's convictions on two grounds: 1) the prosecutor's failure to disclose certain exculpatory information to defendant violated federal constitutional law; and 2) the admission into evidence of defendant's statement to his arresting officer violated defendant's state constitutional right to counsel as construed in *State v. Sanchez,* 129 *N.J.* 261, 609 *A.*2d 400 (1992). *See State v. Knight,* 283 *N.J.Super.* 98, 119, 661 *A.*2d 298 (App.Div.1995).

In *Sanchez, supra,* we held that mere recitation of the *Miranda* warnings does not provide an indicted defendant with information sufficient to make a knowing and intelligent waiver of the right to counsel. 129 *N.J.* at 276, 609 *A.*2d 400. Recognizing that *Sanchez* was decided after Knight's trial had concluded, the Appellate Division nevertheless determined that the *Sanchez* rule applies retroactively and requires the reversal of Knight's convictions. *Knight, supra,* 283 *N.J.Super.* at 112–14, 661 *A.*2d 298.

We granted the State's petition for certification, 142 *N.J.* 575, 667 *A.*2d 192 (1995), and defendant's cross-petition, *ibid.,* primarily to review the Appellate Division's conclusion that the *Sanchez* rule should be afforded retrospective application. We affirm.

I

In March 1990, defendant was tried along with Cesar Glenn for the murder of Glenn Brown, who was also known as Hassan. The State contended that Cesar Glenn held Brown while defendant beat him to death with a pipe.

The State's case against defendant relied heavily on the testimony of Marie Robinson, who claimed to have witnessed the beating. Robinson testified that on the morning of September 12, 1988, she was talking with friends in front of an apartment building located

at 254 Prince Street in Newark. When asked to name those friends, Robinson mentioned a woman known as Hakima and a woman known as Ms. Mohamid. Shortly after 7:00 a.m., Robinson walked inside the apartment building and saw her friend, Glenn Brown, sleeping on the hallway staircase. Robinson woke Brown and told him to go home. Brown explained that he was high, had not slept in four days, and could not go home because someone "was looking for him." Robinson left Brown and rejoined her friends in the front of the building.

According to Robinson, a few minutes later two men who Robinson could not identify entered the hallway of the building from the back door. They were followed by defendant. After finding Brown on the hallway staircase, each of the two unidentified men took one of Brown's arms and dragged him out of the back of the building. Robinson explained that Brown could barely stand up on his own, and remained limp as he was brought out the back door. Robinson moved into the hallway of the building to get a better view of what was happening, and saw the two men hold Brown while defendant hit him in the head with a pipe three or four times. Gunshots were fired, Brown fell to the ground, and the three assailants fled the scene. A state medical examiner corroborated Robinson's story by testifying that Brown's injuries were caused by blunt-force trauma to the head, and that the injuries could have been inflicted by someone wielding a pipe.

Defense counsel vigorously attacked Robinson's credibility. Counsel noted that Robinson's trial testimony was inconsistent with prior statements she had given to the police. Robinson's story had changed regarding where the attack took place, whether anyone else had witnessed the attack, and how much of the attack Robinson herself had observed. Robinson admitted to having previously lied to the police when she told them that she did not know the names of any of the other persons standing in front of the apartment building when the beating took place. She also conceded that she did not contact the police to inform them of what she had witnessed until eleven days after the killing, when

she told her story to her probation officer. At that time Robinson was awaiting sentencing on a possession-of-cocaine charge to which she had pled guilty. However, Robinson emphasized at trial that she had received no benefit as a result of her testimony.

Another aspect of the State's case against defendant concerned a baseball hat found at the crime scene that contained the logo "Pepsi–Cola Teterboro." The State contended that the hat belonged to defendant. Although the State did not offer the hat into evidence, it did offer a picture taken of the crime scene that depicted the hat lying on the ground. A Pepsi employee testified that defendant worked at Pepsi's Teterboro plant in 1985 and 1986, when such hats were distributed to all employees. However, no witness indicated that Brown's attacker was wearing a baseball cap.

The State's case also included evidence seized from defendant when he was arrested in California. Defendant was indicted for the murder of Glenn Brown on December 8, 1988. However, because defendant and his girlfriend, Kathy Capella, had moved to California in October of 1988, New Jersey law enforcement authorities had been unable to find defendant prior to or after his indictment. On October 25, 1989, F.B.I. Agent Mark Wilson and local police officers located and apprehended defendant in Palmdale, California.

At the time of his arrest, defendant was driving a black Ford that belonged to Capella. When the arresting officers searched the car they found a pipe on the floor beneath the front passenger's seat. The State argued at trial that the pipe was the weapon used to kill Brown. The State based that argument on Robinson's testimony that the seized pipe was the same size as the pipe used to kill Brown and that it looked like the same pipe. Capella testified that she had picked up the pipe in September 1989 while jogging in order to ward off a dog. She testified that she later put the pipe in her car and had not used it since.

The trial court also admitted into evidence a statement that defendant allegedly made to Agent Wilson following his arrest.

According to Wilson, defendant waived his *Miranda* rights and stated that while he was living in New Jersey he had been robbed by Brown. After the robbery, defendant learned that someone named Rahaem or Knight had beaten up Brown and inflicted serious injuries in the process. Brown's friends apparently believed that defendant was the culprit, and were looking for defendant to exact revenge for the beating. Defendant thus explained to Wilson that he left New Jersey because he feared for his life and that he did not know that the police were looking for him. Although defendant's explanation was not directly inculpatory, at trial the State used defendant's story to connect him to Brown and to argue that defendant killed Brown to get revenge for the robbery.

Dwight Goines, Brown's cousin, was defendant's primary witness. In his testimony, Goines contradicted Marie Robinson's account of Brown's death. On the day of the murder, Goines was working for the Newark Housing Authority, painting the doors of the apartments in the Prince Street apartment building. Goines testified that shortly after 8:15 a.m., while Goines was painting, Brown approached him and the two spoke for approximately twenty minutes. Brown told Goines that he had been awake all night, but, according to Goines, Brown's physical condition appeared to be normal. After their conversation, Goines went to the front of the building to paint the exterior of the front door and Brown walked toward the back door. While painting outside the front of the building, Goines heard a gun shot. He ran into the building, looked out of a window, and saw two men running from the rear of the building. He then went to the back of the building and saw his wounded cousin lying on the back porch. Goines testified that he did not see either defendant or Marie Robinson at 254 Prince Street on that day.

The jury found defendant guilty of all charged offenses: first-degree murder, *N.J.S.A.* 2C:11-3a(1), (2); fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39-5d; and third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39-

4d. On the murder count, defendant was sentenced to life imprisonment with thirty years of parole ineligibility. The other two counts were merged with the murder conviction. The codefendant, Cesar Glenn, was found not guilty on all counts.

Defendant subsequently moved for a new trial based on newly discovered evidence. In support of that motion, defendant presented the testimony of Kenneth Barnhill, who allegedly was with Brown on the morning of his death and saw Brown beaten to death. Barnhill explained that, around 7:00 a.m. on September 12, 1988, he and Brown were talking while sitting on a bench in front of the building located at 260 Prince Street. They then walked to 254 Prince Street, where Barnhill sat on a car and read a newspaper while Brown went to the back porch of the apartment building. Barnhill testified that a black male with a light complexion later walked into the building, through the hallway, and to the back porch, where he attacked Brown and began beating him with a weapon that Barnhill could not identify. Barnhill testified that a second individual looked on from the hallway, but Barnhill could not be sure if that individual was an accomplice of the assailant. When the beating ended and the assailant left the scene, Barnhill went to the back porch and found Brown lying in a pool of blood. Like Goines, Barnhill testified that he did not see either defendant or Marie Robinson at the scene of the crime. The trial court denied the motion for a new trial, finding that Barnhill's testimony was "wholly untrustworthy" and thus would not have changed the result of defendant's trial.

On appeal, defendant raised nine points of error. *See Knight, supra,* 283 *N.J.Super.* at 108–111, 661 *A.*2d 298. Without reaching the merits of any of those contentions, the Appellate Division remanded the case to the trial court for the creation of a record concerning defendant's allegation that the State had improperly suppressed exculpatory evidence. *See id.* at 107, 661 *A.*2d 298.

During the remand proceedings, defendant pointed to four areas in which the State had failed to provide exculpatory evidence to defendant. The first area involved the credibility of Marie Robin-

son. As noted, Robinson had pled guilty to possession of cocaine shortly before Glenn Brown's death. The plea bargain called for a jail term of up to 364 days. Significantly, the State failed to inform defendant that, at Robinson's October 7, 1988, sentencing hearing, a representative from the prosecutor's office told the sentencing judge that Robinson was cooperating with the State in the Glenn Brown murder investigation and had enabled the State to secure a warrant for defendant's arrest. Robinson was subsequently sentenced to two days time served plus a small fine. Defendant argued that if he had been informed of the Prosecutor's favorable comments and their apparent effect on Robinson's sentence, he could have impeached Robinson's testimony by showing that she had concocted her story to curry favor with the prosecutor's office.

The second area of non-disclosure involved statements made by Hakima, the woman who, according to Marie Robinson, talked with Robinson shortly before the attack on Brown. The State's pre-trial witness list included the name and address of a woman named Kim Royal. Defense counsel was unsuccessful in his efforts to contact Royal at the address provided by the State. The State failed to inform defendant that it had discovered that the woman's correct name was Kim Loyal, and that Loyal was the woman who Robinson called Hakima. More importantly, the State failed to disclose that Loyal had told State investigators that she was near 254 Prince Street around the time of the attack on Brown, but did not see defendant or Robinson there.

The remand hearings also revealed that the State had failed to disclose an F.B.I. teletype sent to Agent Wilson on September 27, 1989, informing him of the facts underlying the charges against defendant. Wilson had testified that he was unaware of that information when he interrogated defendant, and thus the teletype could have been used to impeach Wilson's credibility.

Finally, defendant contended that the State failed to disclose that one of the State's witnesses, Terrence Worthy, had informed law enforcement authorities in July 1988 that Glenn Brown had

been involved in the murder of a man named Benjamin Levine. Defendant claimed that he could have used that information to argue to the jury that Worthy had a motive to kill Brown. Defendant explained that Worthy might have killed Brown because he feared Brown would kill him for implicating Brown in the Levine murder.

In an oral opinion, the trial court ruled that the non-disclosures did not require the reversal of defendant's convictions. The court explained that the non-disclosures were not material to defendant's case and would not have affected the result of the trial. The court reached that conclusion viewing each non-disclosed item in isolation, and made no findings concerning the cumulative effect the suppressed evidence would have had on the jury.

The Appellate Division reversed, finding that defendant's convictions had been obtained in violation of the federal Constitution because " 'there is a reasonable probability that, had the [suppressed] evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Knight, supra*, 283 *N.J.Super.* at 120, 661 *A.*2d 298 (quoting *United States v. Bagley*, 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L.Ed.*2d 481, 494 (1985)). The court found that the Robinson sentencing information and the statements made by Loyal and Worthy to prosecutor's office representatives were exculpatory and material to the issue of defendant's guilt. *Id.* at 111, 121–22, 661 *A.*2d 298.

The Appellate Division offered a second, independent ground for the reversal of defendant's convictions: the admission into evidence of defendant's statement to Agent Wilson contravened this Court's holding in *State v. Sanchez, supra*, 129 *N.J.* 261, 609 *A.*2d 400. Following *Sanchez*, the Appellate Division concluded that because defendant had been indicted by the time of Agent Wilson's interrogation, the uncounseled waiver of defendant's *Miranda* rights did not constitute a valid waiver of his state constitutional right to counsel. *Knight, supra*, 283 *N.J.Super.* at 114, 661 *A.*2d 298. Accordingly, the court held that defendant's statement to Wilson could not be used against him at trial. *Id.* at 118, 661

*A*.2d 298. The Appellate Division acknowledged that *Sanchez* was decided after defendant's trial had concluded, but held that *Sanchez* nonetheless applies to defendant's case. *Id.* at 112–14, 661 *A*.2d 298. The court ruled that such retrospective application of the *Sanchez* decision was appropriate because *Sanchez* did not announce a new rule of law. *Id.* at 113, 661 *A*.2d 298. The court explained that *Sanchez* was merely "a continuation of traditional adherence to a heightened importance of the right to counsel once the criminal adversarial process has begun." *Ibid.*

With regard to defendant's remaining contentions, the Appellate Division briefly noted its approval of the trial court's decision to instruct the jury that it could consider defendant's leaving New Jersey as proof of consciousness of guilt. *Id.* at 111, 661 *A*.2d 298. The court did not address defendant's allegations of prosecutorial misconduct, ineffective assistance of counsel, and trial court error in admitting into evidence the pipe and an out-of-court statement made by co-defendant Cesar Glenn. *See ibid.*

II

In *Brady v. Maryland*, 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196–97, 10 *L.Ed.*2d 215, 218 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Subsequent Supreme Court cases significantly expanded the scope of the *Brady* rule. For example, in *United States v. Agurs*, 427 *U.S.* 97, 107, 96 *S.Ct.* 2392, 2399, 49 *L.Ed.*2d 342, 351–52 (1976), the Court stated that the rule applies where the defendant has made only a general request for all "*Brady* material" and even where the defendant has not made any request at all. In *United States v. Bagley*, 473 *U.S.* 667, 676, 105 *S.Ct.* 3375, 3380, 87 *L.Ed.*2d 481, 490 (1985), the Court confirmed that *Brady* encompasses evidence that the defendant might have used to impeach government witnesses. *Accord Giglio v. United States*, 405 *U.S.* 150, 154, 92

*S.Ct.* 763, 766, 31 *L.Ed.*2d 104, 108 (1972). The Court explained that "[s]uch evidence ... if disclosed and used effectively, ... may make the difference between conviction and acquittal." *Bagley, supra,* 473 *U.S.* at 676, 105 *S.Ct.* at 3380, 87 *L.Ed.*2d at 490. Most recently, in *Kyles v. Whitley,* 514 *U.S.* ——, ——, 115 *S.Ct.* 1555, 1560, 131 *L.Ed.*2d 490, 498 (1995), the Court emphasized that where multiple items of evidence have been suppressed, the prosecution's *Brady* obligation "turns on the cumulative effect" of such evidence. Thus, courts are obligated to consider the State's non-disclosures "collectively, not item-by-item." *Id.* at ——, 115 *S.Ct.* at 1567, 131 *L.Ed.*2d at 507.

▮ Central to the *Brady* analysis is the determination of whether evidence is sufficiently "material" to require its timely disclosure to the defendant. In *Agurs, supra,* 427 *U.S.* at 104–112, 96 *S.Ct.* at 2398–2402, 49 *L.Ed.*2d at 350–55, the Court stated that the standard for ascertaining whether suppressed evidence is material depends on the specificity of the defendant's initial request for the evidence in question. In cases where a specific request has been made, reversal would be required if the suppressed evidence "might have affected the outcome of the trial." *Id.* at 104, 96 *S.Ct.* at 2398, 49 *L.Ed.*2d at 350. If the defendant has made only a general request for "*Brady* material" or no request, reversal would be necessary "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 *S.Ct.* at 2402, 49 *L.Ed.*2d at 355. However, the Court subsequently abandoned the distinction set forth in *Agurs,* and held that, regardless of the specificity of the defendant's request, evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494 (plurality opinion of Blackmun, J.); *id.* at 685, 105 *S.Ct.* at 3385, 87 *L.Ed.*2d at 496 (White, J., concurring); *see Kyles, supra,* 514 *U.S.* at ——, 115 *S.Ct.* at 1565, 131 *L.Ed.*2d at 505.

■ At oral argument in this case, the State conceded that it had suppressed evidence favorable to defendant. Thus, the question before the Court is whether the State's non-disclosures are "material" for purposes of the federal Constitution. We look to the standard set forth in *Bagley, supra,* to resolve this issue. In *State v. Marshall,* 123 *N.J.* 1, 199–200, 586 *A.*2d 85 (1991), this Court declined to apply the *Bagley* materiality test where the defendant had made a specific request for the suppressed evidence, applying instead the specific-request standard found in *Agurs. See also State v. Florez,* 134 *N.J.* 570, 593, 636 *A.*2d 1040 (1994) (noting, in *dicta,* two-tier approach that this Court has taken in *Brady* cases). However, the record in this case indicates that Knight made no specific request for the *Brady* materials at issue. Accordingly, we need not resolve whether, as a matter of state law, we will continue to apply the less demanding *Agurs* test to the State's non-disclosures in a specific-request context. We recognize, however, that *Bagley*'s unitary standard is simpler to apply and that the difference between the *Agurs* and *Bagley* materiality standards may not be sufficiently substantial to justify retention of two different materiality tests for *Brady* violations. To the extent that *Marshall* is inconsistent with that recognition, *Marshall* may be understood to reflect our view that the defendant in that case had not established the materiality of the *Brady* violation even under the less demanding standard imposed by *Agurs* in specific-request situations.

We agree with the Appellate Division that the State in this case violated the *Brady* rule by withholding evidence favorable to defendant and material to the issue of guilt. First, the State suppressed evidence that could have been used to impeach Marie Robinson, the State's only eyewitness and the one person at trial who placed defendant at the scene of the crime. Defense counsel vigorously attempted to impeach Robinson's testimony, revealing the inconsistencies between her testimony and her prior statements, and the discrepancies between her testimony and that of other witnesses. The prosecutor responded by emphasizing in his closing argument that Robinson had no motive to lie:

Now, Marie Robinson has absolutely no reason to tell you anything but the truth.... What do you think she's getting out of this? Nothing. If we were doing something for her, if she got paid, if she got some bargain, if something was being done for her then you would say we know why she's doing this. Marie Robinson obviously is not getting anything at all ... I submit to you you can't find one reason why she's testifying other than the fact that she saw [the beating]....

Had defense counsel known that a representative from the prosecutor's office had spoken on Robinson's behalf at her sentencing hearing, and that Robinson subsequently received a time-served sentence on a plea bargain that called for a jail term of up to 364 days, counsel's ability to impeach Robinson's credibility would have been significantly enhanced.

Kim Loyal's statement further discredits Robinson's account of the crime. Although Robinson testified at trial that she talked with Loyal for ten or fifteen minutes shortly before the attack on Brown, Loyal told the police that she never saw Robinson on the day in question. Moreover, Loyal stated that she did not see defendant when she was in the area of 254 Prince Street around the time of the crime. Confronted with such testimony, the jury might have credited the testimony of Dwight Goines and concluded that defendant was not responsible for the attack on Brown.

In our view, disclosure of the F.B.I. teletype and the statements made by Terrence Worthy would have had minimal impact on defendant's trial. Nevertheless, based on the combined impact of the Loyal statement and the Robinson sentencing information, *see Kyles, supra,* 514 *U.S.* at ——, 115 *S.Ct.* at 1560, 131 *L.Ed.*2d at 498, we conclude that there is a reasonable probability that the result of defendant's trial would have been different had the suppressed evidence been disclosed to the defense. *See Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494. Thus, as the Appellate Division determined, the Due Process Clause of the Constitution requires the reversal of defendant's convictions.

III

Defendant also contends that his statement to F.B.I. Agent Wilson should not have been admitted into evidence at trial

because defendant had not validly waived his right to counsel before speaking with Wilson. The resolution of that issue turns on whether *State v. Sanchez,* 129 *N.J.* 261, 609 *A.*2d 400 (1992), which we decided after Knight's trial had concluded but before the Appellate Division had ruled on his appeal, applies retroactively to this case. Although we have determined that the State's suppression of evidence requires the reversal of defendant's convictions, we address defendant's *Sanchez* contention to provide guidance on the extent to which that decision should be applied retroactively.

## A

This Court has four options in any case in which it must determine the retroactive effect of a new rule of criminal procedure. *See State v. Burstein,* 85 *N.J.* 394, 402–03, 427 *A.*2d 525 (1981). The Court may decide to apply the new rule purely prospectively, applying it only to cases in which the operative facts arise after the new rule has been announced. *Ibid.* Alternatively, the Court may apply the new rule in future cases and in the case in which the rule is announced, but not in any other litigation that is pending or has reached final judgment at the time the new rule is set forth. *Id.* at 403, 427 *A.*2d 525. A third option is to give the new rule "pipeline retroactivity," rendering it applicable in all future cases, the case in which the rule is announced, and any cases still on direct appeal. *Ibid.* Finally, the Court may give the new rule complete retroactive effect, applying it to all cases, including those in which final judgments have been entered and all other avenues of appeal have been exhausted. *Ibid.*

However, before a court chooses from among those four options, it customarily engages in the threshold inquiry of whether the rule at issue is a "new rule of law" for purposes of retroactivity analysis. *Ibid.* Our cases have recognized that if a ruling does not involve a "departure from existing law," the retroactivity question never arises and our power to limit the retroactive effect of a decision is not implicated. *Ibid.* That approach apparently stems from the concept, prevalent at common law, that the duty of courts

was not to pronounce new law but rather to "maintain and expound" extant judicial rulings. *See Linkletter v. Walker*, 381 *U.S.* 618, 622, 85 *S.Ct.* 1731, 1734, 14 *L.Ed.*2d 601, 604 (1965) (quoting 1 William Blackstone, *Commentaries* 69 (15th ed. 1809)), *overruled on other grounds, Griffith v. Kentucky*, 479 *U.S.* 314, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649 (1987). A court could "discover" what the law had always been, but it could not create new law. *Id.* at 623, 85 *S.Ct.* at 1734, 14 *L.Ed.*2d at 605. The recognition that the retrospective effect of a judicial ruling could be restricted was unknown to the common-law courts and incompatible with the common-law view that "[a]n overruled holding was not bad law, it was simply never the law." *State v. Johnson*, 43 *N.J.* 572, 582, 206 *A.*2d 737 (1965), *aff'd*, 384 *U.S.* 719, 86 *S.Ct.* 1772, 16 *L.Ed.*2d 882 (1966); *see Linkletter, supra*, 381 *U.S.* at 623 & n. 6, 85 *S.Ct.* at 1734 & n. 6, 14 *L.Ed.*2d at 604–05 & n. 6. In time, however, courts came to accept that some decisions represent a break from prior jurisprudence, and that to apply such new rules retroactively could inflict unjustified burdens on the courts and law enforcement personnel. *See Linkletter, supra*, 381 *U.S.* at 623–24, 85 *S.Ct.* at 1734–35, 14 *L.Ed.*2d at 605.

In *State v. Lark*, 117 *N.J.* 331, 336, 567 *A.*2d 197 (1989), we discouraged undue emphasis on the old rule/new rule distinction, and noted our reluctance to decide retroactivity questions on the basis of the now-discredited common-law view of law as "perpetual and immutable." *See also* Richard H. Fallon, Jr. & Daniel J. Meltzer, "New Law, Non–Retroactivity, and Constitutional Remedies," 104 *Harv. L.Rev.* 1733, 1833 (1991) ("[T]he question whether to deny retroactive effect to a relatively unpredictable decision is properly governed 'not by metaphysical conceptions of the nature of judge-made law … but by considerations of convenience, of utility, and of the deepest sentiments of justice.' ") (quoting Benjamin Cardozo, *The Nature of the Judicial Process* 148–49 (1921) (footnote omitted)). In *Lark*, we cited approvingly the federal Supreme Court's broad definition of "new rule" that provides that a " 'case announces a new rule when it

breaks new ground or imposes a new obligation on the States or the Federal Government * * * [or] if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.'" *Lark, supra,* 117 *N.J.* at 339, 567 *A.*2d 197 (quoting *Teague v. Lane,* 489 *U.S.* 288, 301, 109 *S.Ct.* 1060, 1070, 103 *L.Ed.*2d 334, 349 (1989)). Moreover, we held that a decision involving an "accepted legal principle" announces a new rule for retroactivity purposes so long as the decision's application of that general principle is "sufficiently novel and unanticipated." *Ibid.*

█ If a decision indeed sets forth a "new rule," three factors generally are considered to determine whether the rule is to be applied retroactively: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." *State v. Nash,* 64 *N.J.* 464, 471, 317 *A.*2d 689 (1974); *accord State v. Gilmore,* 103 *N.J.* 508, 544, 511 *A.*2d 1150 (1986); *Burstein, supra,* 85 *N.J.* at 406, 427 *A.*2d 525. Although those three factors have received detailed attention in our retroactivity case law, our cases also indicate that the retroactivity determination often turns more generally on "the court's view of what is just and consonant with public policy in the particular situation presented." *Nash, supra,* 64 *N.J.* at 469, 317 *A.*2d 689.

"The first factor, the purpose of the new rule, is often the pivotal consideration." *Burstein, supra,* 85 *N.J.* at 406, 427 *A.*2d 525. For example, if the newly announced rule is an exclusionary rule intended solely to discourage police misconduct, then the rule's purpose would not be served by applying the rule to conduct occurring before the rule was announced. For that reason, exclusionary rules are rarely given retroactive effect. *Ibid.* On the other hand, if the old rule was altered because it substantially impaired the reliability of the truth-finding process, the interest in obtaining accurate verdicts may suggest that the new rule be given complete retroactive effect. *Id.* at 406–07, 427 *A.*2d 525.

The second and third factors come to the forefront of the retroactivity analysis when the inquiry into the purpose of the new rule does not, by itself, reveal whether retroactive application of the new rule would be appropriate. *See id.* at 408, 427 *A.*2d 525. The second factor inquires whether law enforcement agents justifiably relied on the old rule in performing their professional responsibilities. *See State v. Catania,* 85 *N.J.* 418, 447, 427 *A.*2d 537 (1981). "The reasoning underlying this inquiry is that state agents should not be penalized for complying in good faith with 'prevailing constitutional norms'" when carrying out their duties. *State v. Howery,* 80 *N.J.* 563, 582, 404 *A.*2d 632 (Pashman, J., dissenting), *cert. denied,* 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.*2d 424 (1979); *accord Catania, supra,* 85 *N.J.* at 447–48, 427 *A.*2d 537. In instances where prior judicial decisions gave state officials reason to question the continued validity of the old rule, the significance of the reliance factor correspondingly decreases. *See Nash, supra,* 64 *N.J.* at 473–74, 317 *A.*2d 689.

The third factor in the retroactivity analysis, the effect a retroactive application would have on the administration of justice, recognizes that courts must not impose unjustified burdens on our criminal justice system. *See Burstein, supra,* 85 *N.J.* at 410, 427 *A.*2d 525. Thus, we generally have avoided applying new rules retroactively when such an application would undermine the validity of large numbers of convictions. We have noted our concern about overwhelming courts with retrials, and our awareness of the difficulty in re-prosecuting cases in which the offense took place years in the past. *See Lark, supra,* 117 *N.J.* at 341, 567 *A.*2d 197; *Burstein, supra,* 85 *N.J.* at 410, 427 *A.*2d 525.

Our three-pronged retroactivity analysis stems from the test set forth by the United States Supreme Court in *Linkletter, supra,* 381 *U.S.* at 636, 85 *S.Ct.* at 1741, 14 *L.Ed.*2d at 612. Over the years, however, the federal jurisprudence shifted course, and the federal Supreme Court eventually abandoned the *Linkletter* factors in favor of a more mechanical approach. Under current federal law, new rules based on interpretation of the federal

Constitution are to be applied to all cases still on direct appeal, *see Griffith v. Kentucky*, 479 *U.S.* 314, 328, 107 *S.Ct.* 708, 716, 93 *L.Ed.*2d 649, 661 (1987), but only in rare circumstances to cases in which all avenues of direct review have been exhausted. *See Teague v. Lane*, 489 *U.S.* 288, 310, 109 *S.Ct.* 1060, 1075, 103 *L.Ed.*2d 334, 356 (1989). Although we have noted our agreement with some of the principles underlying *Teague*, we have continued to determine the retroactivity of state rules of law under the *Linkletter* test. *See Lark, supra*, 117 *N.J.* at 341–42, 567 *A.*2d 197.

Only one other state court has considered the appropriate retroactive effect of a decision announcing a rule akin to the right-to-counsel rule of *Sanchez*. In *People v. Samuels*, 49 *N.Y.*2d 218, 424 *N.Y.S.*2d 892, 400 *N.E.*2d 1344, 1347 (1980), the New York Court of Appeals held that once a felony complaint is filed, a defendant may not waive the right to counsel outside of the presence of defense counsel. Then, in *People v. Pepper*, 53 *N.Y.*2d 213, 440 *N.Y.S.*2d 889, 423 *N.E.*2d 366, 369–70, *cert. denied*, 454 *U.S.* 967, 102 *S.Ct.* 510, 70 *L.Ed.*2d 383 (1981), the New York court applied the three-factor *Linkletter* test and concluded that the *Samuels* rule should be accorded "pipeline retroactivity." The court noted that such a result was consistent with its previous decisions giving limited retroactive effect to new rules involving the pre-trial right to counsel. *See id.* 440 *N.Y.S.*2d at 892, 423 *N.E.*2d at 369.

B

■ The threshold retroactivity issue in this case, whether *Sanchez* announced a new rule of law, is a close question. Our analysis begins with *Patterson v. Illinois*, 487 *U.S.* 285, 108 *S.Ct.* 2389, 101 *L.Ed.*2d 261 (1988) (5–4), which was decided four years before *Sanchez*. In *Patterson*, the United States Supreme Court held that reading the *Miranda* rights to an indicted defendant enables that defendant to make an informed and valid waiver of the Sixth Amendment right to counsel. *See* 487 *U.S.* at 296, 108

*S.Ct.* at 2397, 101 *L.Ed.*2d at 275. The Court rejected the contention that the Sixth Amendment right to counsel is "more difficult to waive than the Fifth Amendment counterpart," while acknowledging that that contention had gained "some acceptance from courts and commentators." *Id.* at 297, 108 *S.Ct.* at 2397, 101 *L.Ed.*2d at 275.

Four years later, in *Sanchez, supra,* 129 *N.J.* at 276–77, 609 *A.*2d 400, "we held that after a defendant has been indicted, administration of *Miranda* warnings during police-initiated interrogation is not adequate to elicit a knowing and voluntary waiver of the right to counsel guaranteed by the State Constitution." *State v. Tucker,* 137 *N.J.* 259, 287, 645 *A.*2d 111 (1994), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 751, 130 *L.Ed.*2d 651 (1995). We saw *Patterson* as a "change[ ] [of] direction" in the Supreme Court's Sixth Amendment jurisprudence, *Sanchez, supra,* 129 *N.J.* at 269, 609 *A.*2d 400, and found the basis for our decision in "our traditional commitment to the right to counsel." *Id.* at 274, 609 *A.*2d 400. Those observations might imply that the rule set forth in *Sanchez* was not "new," but rather, as the Appellate Division found, "a continuation of traditional adherence to a heightened importance of the right to counsel once the criminal adversarial process has begun." *Knight, supra,* 283 *N.J.Super.* at 113, 661 *A.*2d 298.

On the other hand, focusing on the period before *Sanchez* was decided, *Patterson* represented the United States Supreme Court's resolution of the question under the federal Constitution, and the *Patterson* Court squarely had rejected the right-to-counsel argument later accepted in *Sanchez.* Moreover, that we would interpret our State Constitution as we did in *Sanchez* might not have been predicted in view of the fact that "[w]henever possible, we endeavor to harmonize our interpretation of the State Constitution with federal law." *Tucker, supra,* 137 *N.J.* at 291, 645 *A.*2d 111 (citing *State v. Hunt,* 91 *N.J.* 338, 345, 450 *A.*2d 952 (1982)). Indeed, our pre-*Sanchez* right-to-counsel jurisprudence was generally similar to that of the Supreme Court in other

contexts. *See, e.g., State v. Clausell,* 121 *N.J.* 298, 350–53, 580 *A.*2d 221 (1990) (holding that defendant did not validly waive right to counsel, applying parallel analyses under state and federal law); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting, nearly verbatim, federal constitutional standard for effective assistance of counsel); *State v. Bey,* 258 *N.J.Super.* 451, 466, 610 *A.*2d 403 (App.Div.) (noting, in case in which statements were taken from charged defendant outside of presence of his attorney, that "[w]e consider the federal and State constitutional rights to counsel as coextensive in this context"), *certif. denied,* 130 *N.J.* 19, 611 *A.*2d 657 (1992). In addition, even if the Appellate Division was correct in noting that *Sanchez* was "not a *break* with prior law," *Knight, supra,* 283 *N.J.Super.* at 113, 661 *A.*2d 298 (emphasis added), *Sanchez* indeed altered the substance of the law applied by state trial courts ruling on the admissibility of statements taken from indicted, unrepresented defendants. *See, e.g., Sanchez, supra,* 129 *N.J.* at 264, 609 *A.*2d 400 (noting that both trial court and Appellate Division had ruled that Sanchez's confession was admissible). *Sanchez* " 'was not *dictated* by precedent existing at the time the defendant's conviction became final' " and undeniably imposed a new obligation on state law enforcement agents. *Lark, supra,* 117 *N.J.* at 339, 567 *A.*2d 197 (quoting *Teague, supra,* 489 *U.S.* at 301, 109 *S.Ct.* at 1070, 103 *L.Ed.*2d at 349).

We therefore conclude that the *Sanchez* rule is "sufficiently novel and unanticipated" to implicate this Court's power to limit the retroactive effect of its decisions. *Lark, supra,* 117 *N.J.* at 339, 567 *A.*2d 197. Accordingly, we consider whether retroactive application of the *Sanchez* rule would be appropriate.

To guide us in the inquiry into the purpose of the *Sanchez* rule, we look to the rationale for that rule set forth in *Sanchez* itself:

> The return of an indictment transforms the relationship between the State and the defendant. By obtaining the indictment, the State represents that it has sufficient evidence to establish a *prima facie* case. Once the indictment is returned, the State is committed to prosecute the defendant. From that moment, if not before, the prosecutor and the defendant are adversaries. Questioning the

accused can be only "for the purpose of buttressing * * * a prima facie case." The spotlight is on the accused. Under those circumstances, the perfunctory recitation of the right to counsel and to remain silent may not provide the defendant with sufficient information to make a knowing and intelligent waiver. Such a recitation does not tell the defendant the nature of the charges, the dangers of self-representation, or the steps counsel might take to protect the defendant's interests.... Given the adversarial nature of their relationship, for the State's representatives to communicate adequately that information to an indicted defendant would be difficult, nigh to impossible.

[*Sanchez, supra*, 129 *N.J.* at 276–77, 609 *A.*2d 400 (quoting *People v. Settles*, 46 *N.Y.*2d 154, 412 *N.Y.S.*2d 874, 385 *N.E.*2d 612, 616 (1978)) (citations omitted).]

In this case, the inquiry into the purpose of the new rule does not, by itself, reveal whether retroactive application of the rule would be appropriate. Although the *Sanchez* rule is intended, in part, to discourage police interrogation of indicted, unrepresented defendants, it is not solely an exclusionary rule. Similarly, although the rule aims to "enhance the reliability of confessions by reducing the inherent coercion of custodial interrogation," *State v. Reed*, 133 *N.J.* 237, 260, 627 *A.*2d 630 (1993), it does not replace a rule " 'that *substantially impair[ed]* [the] truth-finding function [of the criminal trial].' " *Burstein, supra*, 85 *N.J.* at 406, 427 *A.*2d 525 (quoting *Williams v. United States*, 401 *U.S.* 646, 653, 91 *S.Ct.* 1148, 1152, 28 *L.Ed.*2d 388, 395 (1971)). Accordingly, we must add to our analysis a consideration of the "reliance" and "administration of justice" factors. Those factors are, to an extent, interrelated in this case.

We fail to discern any appreciable reliance by law enforcement officials on pre-*Sanchez* law. Significantly, because of the manner in which our state criminal justice system operates, only in exceptional situations would a New Jersey law enforcement officer attempt to interrogate an indicted defendant outside the presence of a defense attorney. We note that in urban counties the first appearance by criminal defendants occurs in Central Judicial Processing (CJP) courts, *see Tucker, supra*, 137 *N.J.* at 284, 645 *A.*2d 111, and in those courts

forms requesting assigned counsel generally are completed by defendants prior to their initial court appearance, and at that court appearance counsel from the public defender's office are generally available to provide representation. In the CJP courts, as an essential pre-condition of effective case management, defendants are

> presumed to have asserted their expectation to be represented by counsel, and counsel are routinely provided.
>
> [*Ibid.*]

Thus, the prevailing practice across much of the State is to provide counsel to defendants immediately after the criminal complaint is filed—even before the grand jury has returned an indictment. *See id.* at 284–85, 645 *A.*2d 111. (Pursuant to Directive # 3–96, issued by the Administrative Office of the Courts on June 12, 1996, defendants in *all* counties will now be afforded the opportunity to request counsel at their initial court appearance. Presumably counsel will be assigned soon thereafter.) Thus, the *Sanchez* rule, which concerns waiver of the right to counsel by indicted yet unrepresented defendants, is implicated only in those unusual cases in which indicted defendants deliberately forego the right to counsel or absent themselves from their initial court appearance and miss the opportunity to be assigned an attorney. Our assumption is that police do not customarily interrogate indicted and uncounseled defendants.

The third retroactivity factor, the effect retroactive application would have on the administration of justice, militates in favor of limited retroactive application of the *Sanchez* rule. As noted, cases in which the *Sanchez* rule is implicated arise relatively infrequently. Thus, applying *Sanchez* retroactively to cases on direct appeal would neither "be chaotic" nor "overwhelm our courts." *Catania, supra,* 85 *N.J.* at 447, 427 *A.*2d 537; *see State v. Krol,* 68 *N.J.* 236, 267 & n. 15, 344 *A.*2d 289 (1975) (finding that there would be no detrimental effect on justice system if rule affecting thirty-nine persons were applied retroactively). However, administration-of-justice considerations counsel against affording *Sanchez* more than "pipeline retroactivity." To accord *Sanchez* complete retroactive effect would impose on the State the burden of reprosecuting some cases in which the offense took place years in the past. Because of failing memories and unavailable witnesses, the problems encountered in prosecuting such

cases often are insurmountable. *See Lark, supra,* 117 *N.J.* at 341, 567 *A.*2d 197.

 Based on the three retroactivity factors, we conclude that it would be "just and consonant with public policy," *Nash, supra,* 64 *N.J.* at 469, 317 *A.*2d 689, to apply the *Sanchez* rule in this case. Neither the purpose of the *Sanchez* rule, reliance on pre-*Sanchez* law, nor administration-of-justice considerations justify limiting application of the *Sanchez* rule to cases arising after that decision was announced. Because the pre-*Sanchez* rule did not substantially impair the reliability of the truth-finding process, we will not burden the criminal justice system with the post-conviction-relief applications and retrials that would result from a fully retroactive application of the *Sanchez* decision. *Sanchez* will therefore not apply to those defendants who had exhausted all avenues of direct relief at the time *Sanchez* was decided.

We note that this result is consistent with the approach now followed by the federal courts in retroactivity cases, *see Teague, supra,* 489 *U.S.* at 310, 109 *S.Ct.* at 1075, 103 *L.Ed.*2d at 356; *Griffith, supra,* 479 *U.S.* at 328, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661, and with the result reached in many of our own prior retroactivity decisions. *See, e.g., State v. Haliski,* 140 *N.J.* 1, 24, 656 *A.*2d 1246 (1995); *Lark, supra,* 117 *N.J.* at 341, 567 *A.*2d 197; *Gilmore, supra,* 103 *N.J.* at 544, 511 *A.*2d 1150; *State v. Czachor,* 82 *N.J.* 392, 409–10, 413 *A.*2d 593 (1980); *Nash, supra,* 64 *N.J.* at 474, 317 *A.*2d 689; *accord Pepper, supra,* 440 *N.Y.S.*2d at 891–92, 423 *N.E.*2d at 369–70 (granting "pipeline retroactivity" to *Samuels, supra,* 424 *N.Y.S.*2d at 895, 400 *N.E.*2d at 1347, which held that once felony complaint is filed defendant may not waive right to counsel unless defense attorney is present).

## C

The State contends that even if *Sanchez* applies to this case, it does not render inadmissible defendant's statement to F.B.I. Agent Wilson. The State argues that when Agent Wilson took defendant's statement he was acting not on behalf of the State of

New Jersey but rather as an agent of the federal government. The State asserts that it would be improper to require Wilson to comply with state constitutional law concerning the interrogation of criminal defendants.

In *State v. Mollica*, 114 *N.J.* 329, 347, 554 *A.*2d 1315 (1989), we noted that, with regard to law-enforcement activities, "protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity." Our State Constitution ordinarily will not be invoked to regulate the conduct of private citizens or officers of a foreign jurisdiction. *See ibid.* Accordingly, in *Mollica*, we "endorse[d] the principle that federal officers acting lawfully and in conformity to federal authority are unconstrained by the State Constitution, and may turn over to state law enforcement officers incriminating evidence, the seizure of which would have violated state constitutional standards." *Id.* at 355, 554 *A.*2d 1315.

However, we qualified that broad statement with a "vital, significant condition": The seized evidence remains inadmissible in state court if obtained by federal officers acting under color of state law or as agents of state law-enforcement authorities. *Ibid.* Resolving the agency issue entails a fact-sensitive inquiry:

Differing relationships and interactions may suffice to establish agency. Thus, antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of state law. On the other hand, mere contact, awareness of ongoing investigations, or the exchange of information may not transmute the relationship into one of agency.

[*Id.* at 356, 554 *A.*2d 1315.]

The record in this case demonstrates that an extensive cooperative effort between local officials and the F.B.I. led to defendant's arrest. Michael Stigliano, an investigator from the Office of the Essex County Prosecutor, learned of defendant's California residence in September 1989 and informed Agent Ron Bukowicz of the F.B.I.'s Newark office. Stigliano and Bukowicz spoke on

three or four occasions, and their conversations led Bukowicz to send a four-page teletype to Agent Wilson in the F.B.I.'s Los Angeles office. The teletype stated, in part:

ON MONDAY, SEPTEMBER 12, 1988, AT APPROXIMATELY 8:45 AM, AN INDIVIDUAL NAMED GLENN BROWN WAS ASSAULTED AT THE REAR OF 254 PRINCE STREET, NEWARK, NEW JERSEY. BROWN WAS STRUCK SEVERAL TIMES ON THE HEAD WITH A BLUDGEON AND LEFT UNCONSCIOUS. ON SEPTEMBER 14, 1988, BROWN DIED OF THE INJURIES SUSTAINED DURING THE ASSAULT ON HIM OCCURRING ON SEPTEMBER 12, 1988.

SUBSEQUENT INVESTIGATION RESULTED IN THE ARREST OF CO-DEFENDANT CAESAR GLENN AND THE IDENTIFICATION OF CURTIS KNIGHT AS BEING INVOLVED IN THE MURDER OF GLENN BROWN.

CURTIS KNIGHT WAS INDICTED FOR HOMICIDE DURING MARCH, 1989, BY AN ESSEX COUNTY, NEW JERSEY GRAND JURY.

ON 5/17/89, AN UNLAWFUL FLIGHT WARRANT WAS OBTAINED ON KNIGHT BEFORE UNITED STATES MAGISTRATE G. DONALD HANEKE, AT NEWARK, NEW JERSEY. RECOMMENDED BAIL ON KNIGHT IS ONE HUNDRED THOUSAND DOLLARS ($100,000.00) CASH.

ON 9/27/89, DETECTIVE MICHAEL STIGLIANO, ESSEX COUNTY PROSECUTOR'S OFFICE, NEWARK, NEW JERSEY, CONTACTED CASE AGENT IN THIS MATTER AND PROVIDED INFORMATION RELATIVE TO A POSSIBLE LOCATION FOR CURTIS KNIGHT. . . .

. . . .

LOS ANGELES, AT PALMDALE, CALIFORNIA: CONDUCT DISCREET INVESTIGATION AT 3446 BROMLEY COURT, IN ORDER TO ASSESS LIKELIHOOD OF SUBJECT KNIGHT CURRENTLY BEING AT THAT ADDRESS. CONDUCT LOGICAL FOLLOW-UP INVESTIGATION TO LOCATE AND APPREHEND.

. . . .

NEWARK MAINTAINING LIAISON WITH DETECTIVE STIGLIANO, ESSEX COUNTY PROSECUTOR'S OFFICE.

At 8:35 a.m. on October 25, 1989, Agent Wilson and local police officers apprehended and arrested defendant in Palmdale, California. Wilson subsequently "advised [defendant] he was under arrest for unlawful flight in order to avoid prosecution, murder warr[a]nt for the State of New Jersey."

On the afternoon of October 25, F.B.I. agents spoke to a representative of the Essex County Prosecutor's Office to "get some information concerning this case." Agent Wilson then returned to the county jail where defendant was being held to

question him "with reference to this warrant out of New Jersey, this murder warrant."

This record contains information sufficient for us to conclude that Agent Wilson was acting as an agent of the Essex County Prosecutor's Office when he interrogated defendant. This is not a case of "mere contact," *Mollica, supra,* 114 *N.J.* at 356, 554 *A.*2d 1315, between state and federal officials, in which federal officers acted independently in obtaining a confession and then delivered the confession to state agents " 'on a silver platter.' " *Id.* at 347, 554 *A.*2d 1315 (quoting *Lustig v. United States,* 338 *U.S.* 74, 79, 69 *S.Ct.* 1372, 1374, 93 *L.Ed.* 1819, 1823 (1949), *overruled by Elkins v. United States,* 364 *U.S.* 206, 80 *S.Ct.* 1437, 4 *L.Ed.*2d 1669 (1960)). To the contrary, the record reveals the "antecedent mutual planning, joint operations, cooperative investigations, [and] mutual assistance between federal and state officers" that establish an agency relationship for purposes of the *Mollica* doctrine. *Supra,* 114 *N.J.* at 356, 554 *A.*2d 1315. Accordingly, defendant's statements to Agent Wilson are rendered inadmissible by this Court's decision in *Sanchez, supra.*

## IV

Of defendant's remaining contentions, we briefly address the two that are likely to arise on retrial. The trial court properly admitted into evidence the pipe found in the car defendant was driving at the time of his arrest. The circumstances under which the pipe was found, along with Robinson's testimony that the seized pipe is the same color and length as, and "looks like," the weapon used to kill Glenn Brown, provided a sufficient evidentiary foundation for the pipe. *Cf. State v. Holland,* 59 *N.J.* 451, 457, 283 *A.*2d 897 (1971) (holding that trial court properly admitted into evidence shovel found in garbage dump and described by witness as similar or identical to shovel he saw defendant carrying day after murder; victim had been buried in shallow grave allegedly dug by defendant and his accomplice). While the seized pipe lacks distinctive characteristics that could serve to differentiate it from

other pipes of similar length and color, defendant's interests can be protected by an adequate cross examination that emphasizes how easily a pipe may be misidentified.

The propriety of a flight charge in this case will depend on the evidence adduced at defendant's retrial. We draw the trial court's attention to our decisions in *State v. Long*, 119 *N.J.* 439, 499, 575 *A.*2d 435 (1990) ("Mere departure ... does not imply guilt. Flight requires departure from a crime scene under circumstances that imply consciousness of guilt." (citation omitted)), and *State v. Sullivan*, 43 *N.J.* 209, 238–39, 203 *A.*2d 177 (1964) ("For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt."), *cert. denied*, 382 *U.S.* 990, 86 *S.Ct.* 564, 15 *L.Ed.*2d 477 (1966).

## V

We affirm the judgment of the Appellate Division.

COLEMAN, J., concurring in part and dissenting in part.

I dissent from the Court's holding that *State v. Sanchez*, 129 *N.J.* 261, 609 *A.*2d 400 (1992) should apply retroactively to pipeline cases. The effect of that holding is to require the suppression of an otherwise reliable inculpatory statement by defendant because an F.B.I. Agent in California did not predict that New Jersey would not follow a sixteen-month old decision of the United States Supreme Court.

Defendant was indicted in New Jersey on December 8, 1988, for the murder of Glenn Brown. He was located and arrested in California on October 25, 1989, by F.B.I. Agent Mark Wilson and local police officers in Palmdale, California. After his arrest, Agent Wilson read defendant his *Miranda* rights, and defendant signed a written *Miranda* waiver. Defendant then gave a state-

ment to Agent Wilson, which was used at trial to connect defendant to Brown and support the theory that defendant killed Brown to avenge an alleged robbery. *Ante* at 241, 678 *A.*2d at 646.

Applying *Sanchez,* the Court holds that because defendant had been indicted prior to Agent Wilson's interrogation of defendant, the uncounseled waiver did not constitute a valid waiver of his state constitutional right to counsel. *Ante* at 244 and 261, 678 *A.*2d at 648 and 657. I dissent from the Court's retroactive application of *Sanchez* because *Sanchez* announced a new rule of law and *any* retroactive application places an unjustifiable burden on law enforcement.

The *Sanchez* rule was an unanticipated break with existing law that was announced after the conclusion of defendant's trial. At the time Agent Wilson interrogated defendant, the controlling federal law held that reading the *Miranda* rights to an indicted defendant provides a sufficient basis from which the defendant can make a valid waiver of his or her Sixth Amendment right to counsel. *Patterson v. Illinois,* 487 *U.S.* 285, 296, 108 *S.Ct.* 2389, 2397, 101 *L.Ed.*2d 261, 275 (1988). As the majority points out, *Patterson* was consistent with our law and New Jersey did not announce a different rule until nearly four years later when *Sanchez* was decided. *Ante* at 254–256, 678 *A.*2d at 653–654. Thus, *Sanchez* represented a new rule that could not have been predicted.

I fail to see why a rule that served New Jersey well in assuring the reliability of confessions for *thirty* years under its existing constitution after *Miranda* was decided in 1966 should overnight be found so unreliable as to justify retroactive application of a new rule. The Court rationalizes its conclusion by conjecturing that law enforcement did not rely on *Patterson. Ante* at 256, 678 *A.*2d at 654. I disagree. It is hard to imagine a rule more deeply etched in the minds of law enforcement agents than the *Miranda* warnings and its progeny, of which *Patterson* is a part. Indeed, this Court said as much in *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986) when it stated, "We are confident that by now the police

are intimately familiar with *Miranda* and what that case requires by way of warnings." *Hartley, supra,* 103 *N.J.* at 255 n. 1, 511 *A.*2d 80. Agent Wilson had every right to rely on the United States Supreme Court's *Patterson* rule when he interrogated defendant only *sixteen* months after *Patterson* was decided.

This is not a case in which law enforcement failed to scrupulously honor a previously invoked right of silence that would render defendant's statement to be unconstitutionally compelled. Rather, the case involves the assertion, based on *Sanchez,* that defendant's waiver was not knowing, intelligent and voluntary because he had been indicted. As such, the reliability of defendant's statement would not be enhanced by application of the *Sanchez* rule.

I believe there was justifiable reliance by the law enforcement community on the *Patterson* rule. "Such justifiable reliance should not be punished by retroactive application of the [new] rule" established in *Sanchez. State v. Catania,* 85 *N.J.* 418, 447, 427 *A.*2d 537 (1981). The State's agents should not be penalized for relying in good faith on United States Supreme Court constitutional law prevailing at the time defendant was interrogated by F.B.I. Agent Wilson.

I would therefore apply the *Sanchez* rule to cases in which *Miranda* warnings were given to indicted defendants after July 23, 1992, the date *Sanchez* was decided. In all other respects, I concur in the Court's opinion.

Justice GARIBALDI, joins in this opinion.

*For affirmance*—Justices HANDLER, POLLOCK, O'HERN and STEIN—4.

*Concurring in part; dissenting in part*—Justices GARIBALDI and COLEMAN—2.